Leonard H. Sandler, J.
The most 'important of the several interesting issues presented by the proof in this case is whether or not the doctrine of constructive eviction is available to a residential tenant when a landlord is responsible for conditions that render part of the premises uninhabitable, and the tenant abandons that part but continues to reside in the rest of the premises. Put in another way, the question is whether New York law should recognize the doctrine of partial constructive eviction as a counterpart to partial actual eviction precisely as it has recognized for over a century constructive eviction as a counterpart to actual eviction. (See Dyett v. Pendleton, 8 Cow. 727.)
After a careful review of the authorities, I have concluded that the concept of partial constructive eviction is sound in principle, is supported by compelling considerations of social policy and fairness, and is in no way precluded by controlling precedent.
On May 26, 1963, the defendant entered into a lease with the then 'Owner of 301 East 69 Street, with respect to apartment 18E under which the defendant agreed to pay rent for the apartment from December 1, 1963 to November 30, 1966 in the amount of $425 per month. The apartment in question had a terrace.
In April, 1966, the plaintiff acquired the building. At the end of July, 1966, the defendant and his family vacated the apartment and refused to pay rent for the months of August, September, October and November, 1966, the remaining period of the lease. Accordingly, plaintiff sued for the total of the four months rent, for the reasonable value of legal services, and for specific items of damages allegedly caused by the defendants. As to the last, I find the proof wholly deficient and these claims are accordingly dismissed.
The defense to the suit for rent rests upon the claim that the defendant was constructively evicted from the apartment as a result of the misconduct and neglect of the landlord, which allegedly rendered the terrace uninhabitable.
In addition, the defendant sues for damages to his furniture caused by the landlord’s neglect, but this claim clearly must fail since the proof established that the damage complained of occurred before the plaintiff acquired the building. Finally, the defendant seeks return of his security in the amount of $425.
The central factual issue turns on the condition of the terrace and the factors causing that condition.
I find that from early 1965 the central air conditioner emitted quite steadily a green fluid and a stream of water overflow that *278 fell in significant quantities on the terrace. I further find that the incinerator spewed forth particles of ash that were deposited in substantial part upon the terrace. The result was to render the terrace effectively unusable for its intended purposes, and the defendant and his family promptly abandoned the terrace, although it had been a prime factor in inducing them to enter the lease.
Nevertheless, I am unable to conclude that the departure of the defendant and his family from the apartment at the end of July, 1966 constituted their constructive eviction from the entire premises. The evidence clearly discloses that the terrace had become unusable no later than the early spring of 1965, and quite possibly earlier. The law is clear that the abandonment must occur with reasonable promptness after the conditions justifying it have developed. (See 1 Basch, Landlord and Tenant, § 877, and cases cited.)
Unquestionably, this rule should be given a flexible interpretation in light of the practical difficulties these days in finding satisfactory apartments. Moreover, tenants have a right to rely on assurances that the landlord will correct the objectionable conditions.
Although the question is troublesome, I have concluded that a delay of at least 17 months in moving, without any significant proof of an early sustained effort to find other apartments, cannot be reconciled with the current requirements of law.
Turning to the issue of partial eviction, the proof quite plainly established that the terrace had been promptly abandoned once the condition complained of had developed. I am satisfied that conforming the pleadings to the proof to permit consideration •of the issue of partial eviction would serve the interests of justice. (CPLR 3025, subd. [c].)
Although the matter is not clear, I am inclined to believe that the proof before me spelled out an actual partial eviction. It seems to me that the tangible and concrete physical character of the substances falling on the terrace provides a substantial basis for such a finding.
However, I do not rest my decision on that ground in view of the decision of the New York Court of Appeals in Barash v. Pennsylvania Term. Real Estate Corp. (26 N Y 2d 77). Although the facts of the Barash case do not preclude such a finding, the wording of the opinion plainly suggests a disposition to define actual eviction rather narrowly. I therefore turn to consider the status of partial constructive eviction under New York law.
*279 In his authoritative treatise, Basch flatly asserted that constructive eviction requires ‘ ‘ surrender of the entire possession by the tenant.” (See 1 Basch, Landlord and Tenant, § 876.)
None of the eases he cites, however, supports that sweeping assertion. These cases, with many others, repeat the general formula that constructive eviction requires abandonment of the premises. None of the cases I have examined squarely address the question here presented of the legal effect of abandonment of only that part of the premises rendered uninhabitable.
The doctrine of constructive eviction was developed by analogy to actual eviction on the basis of a very simple and obvious proposition. If a tenant is effectively forced out of leased premises^ as a result of misconduct by a landlord that substantially impairs enjoyment of the leased premises, the same legal consequences should follow as though the evicted were physically evicted.
In the eloquent landmark decision that firmly established constructive eviction in New York law, Dyett v. Pendleton (8 Cow. 727, supra) the following was said at page 734: “ Suppose the landlord had established a hospital for the small pox, the plague, or the yellow fever, in the remaining part of this house; suppose he had made a deposit of gunpowder, under the tenant, or had introduced some offensive and pestilential materials of the most dangerous nature; can there be any hesitation in saying that if, by such means, he had driven the tenant from his habitation, he should not recover for the use of that house, of which, by his own wrong, he had deprived his tenant? It would need nothing but common sense and common justice to decide it.”
Why should a different test be applied where the tenant, through comparable means, is effectively deprived of the use of part of his- residence, and abandons that part? Ought not the same consequences to follow as would follow an ‘ ‘ actual partial eviction ”?
I am unable to see any basis in “ common sense and common justice ’ ’ for treating the two situations differently.
Support for this view appears in the careful phrasing of the first decision to establish the requirement of abandonment in constructive eviction cases (Edgerton v. Page 20 N. Y. 281, 284, 285). The Court of Appeals squarely rested the requirement on the unfairness of suspending rent while the tenant continued to occupy the “entire premises.” “I cannot see upon what principle the landlord should be absolutely barred from a recovery of rent, when his wrongful acts stop short of depriving the tenant of the possession of any portion of the *280 premises. * * T The true rule, from all the authorities is, that while the tenant remains in possession of the entire premises demised, his obligation to pay rent continues.”
While some later opinions have been less carefully worded, I know of none that requires a different result.
While the view here expressed seems to me inherent in “ common sense and common justice ” that gave rise originally to the doctrine of constructive eviction, the result is independently compelled by considerations of fairness and justice in the light of present realities.
It cannot be seriously disputed that a major shortage in residential housing has prevailed in our metropolitan area for several decades. The clear effect has been to undermine so drastically the bargaining power of tenants in relation to landlords that grave questions as to the fairness and relevance of some traditional concepts of landlord-tenant law are presented.
The very idea of requiring families to abandon their homes before they can defend against actions for rent is a baffling one in an era in which decent housing is so hard to get, particularly for those who are poor and/ without resources. It makes no sense at all to say that if part of an apartment has been rendered uninhabitable, a family must move from the entire dwelling before it can seek justice and fair dealing.
Accordingly, I hold that when the defendant and his family ceased to use the terrace, a partial constructive eviction occurred with the same legal consequences as attends a partial * ‘ actual ’ ’ eviction.
These consequences were comprehensively defined in Peerless Candy Co. v. Halbreich (125 Misc. 889). It is clear that from the time of the partial eviction, the defendant had the right to stop paying rent. Accordingly, I find against the plaintiff on its action for rent and legal expenses, and for the defendant on his action to recover the security deposit of $425.
Judgment should be entered for the defendant for $425' with interest from August 1, 1966.