■ MINJAK Co., Respondent, v DIANE RANDOLPH et al., Appellants.

In July of 1983 petitioner landlord commenced the within summary nonpayment proceeding against respondents Randolph and Kikuchi, tenants of a loft space on the fourth floor of petitioner's building on West 20th Street in Manhattan, alleging nonpayment of rent since July 1981. The tenants' answer set forth as affirmative defenses that because they were unable to use two thirds of the loft space due to the landlord's renovations and other conditions, they were entitled to an abatement of two thirds of the rent, and that as to the remaining one-third space, they were entitled to a further rent abatement due to the landlord's failure to supply essential services. The tenants also counterclaimed for breach of

warranty of habitability, seeking both actual and punitive damages and attorney's fees.

A trial was held in Civil Court before Justice Saxe in November of 1983. It was stipulated that rent was due and owing from October 1981 through November 1983 in the amount of $12,787 ($200 due for Oct. 1981, $450 due each month from Nov. 1981 through Dec. 1982, and $567 per month since Jan. 1983).

Respondents commenced residency of the loft space in 1976 pursuant to a commercial lease. Petitioner offered a commercial lease even though at the time of the signing of the lease the building was used predominantly for residential purposes and the respondents had informed petitioner that they would use the loft as their residence. The loft space measures 1,700 square feet, approximately two thirds of which is used as a music studio for Mr. Kikuchi, where he composes, rehearses and stores his very expensive electronic equipment and musical instruments. The remainder of the space is used as the tenants' residence.

Late in 1977, the fifth-floor tenant began to operate a health spa equipment business which included the display of fully working jacuzzis, bathtubs, and saunas. The jacuzzis and bathtubs were filled to capacity with water. From November 1977 through February 1982, respondents suffered at least 40 separate water leaks from the fifth floor. At times the water literally poured into the bedroom and bedroom closets of respondents' loft, ruining their clothes and other items. Water leaked as well into the kitchen, the bathroom and onto Mr. Kikuchi's grand piano and other musical instruments. Respondents' complaints to petitioner went unheeded.

In January of 1978 the fifth-floor tenant began to sandblast the walls, causing sand to seep through openings around pipes and cracks in the ceiling and into respondent's loft. The sand, which continued to fall into the loft even as the parties went to trial, got into respondents' clothes, bed, food and even their eyes.

In September of 1981, the landlord commenced construction work in the building to convert the building into a class A multiple building. To convert the freight elevator into a passenger elevator, petitioner had the elevator shaft on respondent's side of the building removed. The workers threw debris down the elevator shaft, raising "huge clouds of dust" which came pouring into the loft and settled everywhere, on respondents' clothes, bed, food, toothbrushes and musical

equipment. The musical equipment had to be covered at all times to protect it from the dust. Respondents began to suffer from eye and sinus problems, nausea, and soreness in their throats from the inhalation of the dust. Respondents attempted to shield themselves somewhat from the dust by putting up plastic sheets, only to have the workmen rip them down.

To demonstrate the hazardous nature of some of the construction work, respondents introduced evidence that as the landlord's workers were demolishing the stairs from the seventh floor down, no warning signs were posted, causing one visitor to come perilously close to falling through a hole in the stairs. The workers jackhammered a new entrance to the loft, permitting the debris to fall directly onto the floor of respondents' loft. The workmen would mix cement right on respondents' floor. A new entrance door to the loft was sloppily installed without a door sill, and loose bricks were left around the frame. A day later, brick fragments and concrete fell on tenant Randolph's head as she closed the door.

The record contains many more examples of dangerous construction and other conduct interfering with respondents' ability to use and enjoy possession of their loft. From 1981 until the time of trial, Kikuchi was completely unable to use the music studio portion of the loft. His musical instruments had been kept covered and protected against the sand and later the dust since 1978.

The jury rendered a verdict awarding respondents a rent abatement of 80% for July 1981 through November 1983, as compensatory damages on the theory of constructive eviction from the music studio portion of the loft; a 40% rent abatement for January 1981 through November 1983, on the remainder of the rent due for the residential portion of the premises, on a theory of breach of warranty of habitability; a 10% rent abatement on the rent attributable to the residential portion of the premises for all of 1979, on a breach of warranty of habitability theory; and punitive damages in the amount of $20,000. After trial the court granted respondents' motion made pursuant to Real Property Law § 234 for reasonable attorney's fees, awarding respondents $5,000. The court also granted petitioner's motion to set aside the verdict and for other relief, only to the extent of reducing the award for punitive damages to $5,000. Final judgment was entered on March 23, 1984.

On appeal to the Appellate Term that court reversed the judgment. Holding that the doctrine of constructive eviction

could not provide a defense to this nonpayment proceeding, because tenants had not abandoned possession of the demised premises, the court reversed the jury's award as to the 80% rent abatement predicated on the constructive eviction theory. The court ordered a new trial on the counterclaim for breach of warranty of habitability, concluding it likely that the jury's consideration of the constructive eviction claim impacted on the breach of warranty of habitability claim. The court also struck down the award of punitive damages, concluding that, even if punitive damages could properly be awarded in habitability cases, the facts herein did not support a finding of "high moral culpability" or "criminal indifference to civil obligations", as required by *Walker v Sheldon* (10 NY2d 401, 405), so as to warrant punitive damages. We reverse and hold that the tenants were entitled to avail themselves of the doctrine of constructive eviction based on their abandonment of a portion of the premises and that the award for punitive damages was permissible and warranted by these facts.

We agree with the holding and reasoning of *East Haven Assocs. v Gurian* (64 Misc 2d 276) that a tenant may assert as a defense to the nonpayment of rent the doctrine of constructive eviction, even if he or she has abandoned only a portion of the demised premises due to the landlord's acts in making that portion of the premises unusable by the tenant. The rule of *Edgerton v Page* (20 NY 281) the first decision to establish the requirement of abandonment of premises as a condition to asserting the defense of constructive eviction, is not undermined by our acknowledgement of a defense for partial constructive eviction. *Edgerton v Page (supra,* at 285) emphasized that the tenant's obligation to pay rent continues as long as "the tenant remains in possession of the *entire premises* demised" (emphasis added). It is not contrary to this rule nor against any established precedent to hold that when the tenant is constructively evicted from a portion of the premises by the landlord's actions, he should not be obligated to pay the full amount of the rent. *(East Haven Assocs. v Gurian, supra,* 64 Misc 2d, at 279-280.) Indeed "compelling considerations of social policy and fairness" dictate such a result. *(Supra,* at 277.) None of the cases cited by the landlord reaches or warrants a contrary conclusion. *(See, Barash v Pennsylvania Term. Real Estate Corp.,* 26 NY2d 77, 83; *Two Rector St. Corp. v Bein,* 226 App Div 73, 76; *300 W. 56th St. Corp. v Kelly,* 153 NYS2d 978.)

As for petitioner's argument on appeal that the tenants never abandoned any portion of the premises and, in fact,

continued to use the entire loft even up until the day of trial, we note that this assertion is unaccompanied by any citation to the record. This was no mere inadvertent error, for there is absolutely nothing in the record to support such a claim. The evidence at trial fully supported a finding that respondents were compelled to abandon the music studio portion of the loft due to "the landlord's wrongful acts [which] substantially and materially deprive[d] the tenant[s] of the beneficial use and enjoyment" of that portion of the loft. *(Barash v Pennsylvania Term. Real Estate Corp., supra,* 26 NY2d, at 83.)

Petitioner does, however, correctly point out that as the constructive eviction claim was asserted as a defense to the nonpayment of rent and respondents did not request an abatement for any months other than those in which they did not pay rent, the jury's award of an 80% rent abatement as to the months July, August, September and half of October of 1981 must be stricken.

The award for punitive damages, as reduced by the Civil Court to $5,000, should be reinstated as well. Although no exception to the court's charge permitting the jury to award punitive damages was made, we discuss the issue of the propriety of submitting this issue to the jury in light of petitioner's argument that the award subjects it to a liability for which there is no support in the law and in light of Appellate Term's inconclusive comment on whether or not punitive damages could, as a matter of law, be awarded in habitability cases.

Although generally in breach of contract claims the damages to be awarded are compensatory, in certain instances punitive damages may be awarded when to do so would "deter morally culpable conduct". *(Halpin v Prudential Ins. Co.,* 48 NY2d 906, 907; *Williamson, Picket, Gross v Hirschfeld,* 92 AD2d 289, 295 [punitive damages for conduct involving bad faith].) The determining factor is " 'not the form of the action * * * but the moral culpability of the defendant' " and whether the conduct implies a "criminal indifference to civil obligations." *(Walker v Sheldon, supra,* 10 NY2d, at 404-405.)

With respect to this State's strict housing code standards and statutes, made enforceable through civil and criminal sanctions and other statutory remedies, it is within the public interest to deter conduct which undermines those standards when that conduct rises to the level of high moral culpability or indifference to a landlord's civil obligations. Therefore, it has been recognized that punitive damages may be awarded in breach of warranty of habitability cases where the landlord's

actions or inactions were intentional and malicious. *(See, e.g., Pleasant E. Assocs. v Cabrera,* 125 Misc 2d 877, 883-884; *Century Apts. v Yalkowsky,* 106 Misc 2d 762, 766; *Davis v Williams,* 92 Misc 2d 1051, 1054-1055; *Kipsborough Realty Corp. v Goldbetter,* 81 Misc 2d 1054, 1058-1060.)

Accordingly, the issue of punitive damages was properly submitted to the jury, and we are satisfied that this record supports the jury's finding of morally culpable conduct in light of the dangerous and offensive manner in which the landlord permitted the construction work to be performed, the landlord's indifference to the health and safety of others, and its disregard for the rights of others, so as to imply even a criminal indifference to civil obligations. *(See, Walker v Sheldon, supra,* 10 NY2d, at 405.) One particularly egregious example of the landlord's wanton disregard for the safety of others was the way in which the stair demolition was performed: steps were removed and no warning sign even posted. The landlord's indifference and lack of response to the tenants' repeated complaints of dust, sand and water leak problems demonstrated a complete indifference to their health and safety and a lack of concern for the damage these conditions could cause to the tenants' valuable personal property. Such indifference must be viewed as rising to the level of high moral culpability. Accordingly, the award of punitive damages is sustained.

We likewise reject petitioner's argument that respondents cannot rely on their lease in order to recover attorney's fees pursuant to the provisions of Real Property Law § 234. This statute has the effect, *inter alia,* of implying into a lease for residential property which contains a provision permitting the landlord to recover attorney's fees in a summary proceeding brought pursuant to the lease a similarly binding covenant by the landlord to pay the tenant's reasonable attorney's fees incurred in the successful defense of a summary proceeding commenced by the landlord arising out of the lease. We find totally without merit petitioner's interpretation of the decision of another Civil Court Judge, holding that the landlord could not take advantage of the waiver of jury trial lease provision, as meaning that respondents cannot now rely on the lease at all in seeking an award of attorney's fees. This is an action under the lease and this lease has not been voided. Furthermore, residential occupants of lofts are afforded the same protections available to other residential tenants under the Real Property Law *(see,* Multiple Dwelling Law § 286 [11]). Thus, the award for attorney's fees was proper.

Except to eliminate any rent abatement for July through mid-October of 1981, the Civil Court judgment should be reinstated. Concur—Sandler, J. P., Carro, Asch and Ellerin, JJ.