■ LINCOLN PLAZA TENANTS CORP., Respondent, v MDS PROPERTIES DEVELOPMENT CORP., Appellant, et al., Defendant. LINCOLN PLAZA TENANTS CORP., Respondent, v MDS PROPERTIES DEVELOPMENT CORP., Appellant, et al., Respondents.—Order, Supreme Court, New York County (David H. Edwards, J.), entered August 22, 1989, which, *inter alia,* granted defendant MDS Properties Development Corp.'s two motions for preliminary injunctive relief only to the extent of directing said defendant to submit to plaintiff electrical plans within 60 days, plaintiff to approve or, with specificity, disapprove such plans within 30 days of receipt, and defendant, in the event of such disapproval, to then use its best efforts to comply with any change reasonably proposed by plaintiff, and otherwise denied such motions; and granted plaintiff's motion for summary judgment on its claims of indemnification of attorneys' fees and costs in action No. 1 and for unpaid rent, attorneys' fees and costs in action No. 2 and for summary judgment dismissal of the counterclaims of defendant MDS in both actions, unanimously modified, on the law, to the extent of denying landlord's motion for summary judgment dismissal of said defendant's first and third counterclaims in action No. 1 and its counterclaim in action No. 2, reinstating and remanding those claims for immediate trial, and the order is otherwise affirmed, without costs.

Potentially valuable ground floor and basement commercial space at the West 62nd Street cooperative apartment building had never been developed. By 20-year lease between plaintiff and defendant MDS Properties Development Corp. dated August 15, 1985, said defendant was to renovate the space into medical suites, which would then be sublet to health care professionals.

Article 41 of the lease provided, as to "Electricity and Other Utilities" as follows: "Tenant shall, at its own cost, make arrangements with the governmental bodies and public utility companies serving the building for the direct supply to Tenant of water, electricity, gas, heat, steam, air conditioning, and

any other utilities to be used by Tenant in the conduct of its business at the demised premises. Landlord shall at its own expense install an 800 ampere switch at the electrical distribution box serving the demised premises, but it shall be solely Tenant's obligation, at Tenant's sole cost and expense, to bring such service into the demised premises. Tenant shall, at its own cost, install electricity and gas and other meters necessary to measure Tenant's entire consumption of such utilities for all purposes."

However, another subsection of the same article of the lease gave tenant the option, in the event landlord determined to discontinue receiving steam heat from Con Edison and install its own boiler, to receive heat from landlord's heat generating plant. Further, article 51, entitled "Tenant's Alterations", provided "Tenant agrees that Landlord has no obligation to perform any work or provide any utilities or services in or to the demised premises. Notwithstanding the foregoing Landlord agrees to maintain existing utility lines, pipes, risers and feeders up to the demised premises". The lease required payment of rent "without any setoff or deduction whatsoever."

The parties have engaged in continuous disputes concerning electrical, steam heat and sewage service and hookups. Landlord rejected tenant's electrical plans for portions of the demised premises in August 1986 and has maintained that no more than 575-ampere service could be safely provided. In response to landlord's demands, tenant purchased new and larger capacity ejection pumps for the building's sewage system in order to be allowed to hook up to that system, but the parties then disagreed as to where those pumps should be installed. Landlord has maintained tenant has no right to install them outside the demised premises, while tenant maintains the pumps cannot operate efficaciously within the demised premises. It has been landlord's position that tenant is entitled to access to the building's main steam line, but at a point before its pressure reduction equipment, such that tenant would have to install its own such equipment within the demised space. Tenant has relied on alternate sources of heat, but maintains that landlord's position is unsupported by the language of the lease and unreasonable in practice.

Landlord commenced action No. 1 seeking an injunction against use of the demised premises until the certificate of occupancy was amended, as well as indemnification for attorneys' fees in connection with that claim as provided by the lease. While the primary cause of action was mooted by February 1987 amendment to the certificate of occupancy,

permitting use of the space for medical offices, the attorneys' fees claim remains outstanding, as did tenant's five affirmative defenses-counterclaims. These included claims of breach of lease, partial constructive eviction and for a declaratory judgment that it was entitled to electrical, steam and sewage hookups to landlord's connections. When tenant stopped paying rent, landlord brought a summary nonpayment eviction proceeding; tenant asserted a single affirmative defense-counterclaim for breach of the lease. The two actions were consolidated in Supreme Court, New York County. On two occasions, in November 1986 and May 1987, tenant moved for preliminary injunctive relief seeking to require landlord to allow it to make utility connections. Thereafter, landlord moved for summary judgment. Supreme Court addressed the three motions in a single decision dated April 19, 1989. The lease was found to be unambiguous as to landlord's lack of obligation to provide electricity, steam and/or sewage services to tenant. The court further found no evidence that landlord had unreasonably rejected tenant's plans or prevented completion of renovations. However, in order to dissolve the impasse which had developed, the court directed tenant to submit within 60 days detailed electrical plans; within 30 days of receipt, landlord was to approve such plans or reject them with specificity and in turn, tenant was to use its best efforts to comply with reasonable changes proposed by landlord. As to steam and sewage, tenant was permitted access to the building's main lines only in the manner urged by landlord.

We find the lease to be ambiguous with respect to the parties' ongoing dispute concerning utility services and hookups. While it is clear landlord is not required to perform any work or incur any expense, other than the installation of an 800-ampere electrical switch, the lease does not delineate the manner in which tenant was to connect to utility lines or obtain utility services. Given that tenant was to have access to landlord's electrical distribution box, that landlord was to maintain existing utility lines, pipes, risers and feeders up to the demised premises, and that tenant had the option of receiving heat from landlord in the event landlord installed its own heat generating plant, it cannot be said that the lease provision requiring tenant to make its own arrangements for the direct supply of utilities, by itself, governs and resolves these disputes. In this context, "direct supply" may relate to the requirement that tenant's utilities be independently metered. Therefore, the embrace of landlord's position, as a matter of law, as to steam and sewage connections was im-

proper. Moreover, the disposition failed to address the parties' actual disputes or significantly advance resolution thereof. Factual issues are plainly presented by the question of the amount of the electricity which can be safely drawn from the 800-ampere switch, installation of which by landlord was required under the lease, and whether the pumps purchased by tenant upon landlord's demand could work efficaciously in the location urged by landlord. In this posture, tenant's first and third counterclaims in action No. 1 and its counterclaim in action No. 2, all concerning landlord's obligations with respect to utility services and hookups, should not have been summarily dismissed. In light of the provision of the commercial lease requiring payment of rent "without any setoff or deduction whatsoever", we do not disturb the dismissal of these claims as affirmative defenses or the award of summary judgment to plaintiff as to defendant's liability for unpaid rent *(Earbert Rest. v Little Luxuries,* 99 AD2d 734).

In light of the sharp factual disputes, defendant is not entitled to any additional injunctive relief *(Hartford v Resorts Intl.,* 43 AD2d 828). We also note tenant's second counterclaim in action No. 1, based on the theory of partial constructive eviction, was properly dismissed, as no evidence was presented that it abandoned or surrendered any portion of the demised premises *(Barash v Pennsylvania Term. Real Estate Corp.,* 26 NY2d 77; *Minjak Co. v Randolph,* 140 AD2d 245). We have examined defendant's other claims and find them to be without merit. Concur—Ross, J. P., Carro, Asch, Wallach and Smith, JJ.