**PARKE–HAYDEN, INC., Plaintiff,**

v.

**LOEWS THEATRE MANAGEMENT CORP., Defendant.**

**No. 91 Civ. 0215 (RWS).**

United States District Court, S.D. New York.

April 20, 1992.

Davis & Gilbert, New York City (Bruce Ginsberg, of counsel), for plaintiff.

Marks Murase & White, New York City (Douglas J. Danzig, of counsel), for defendant.

## OPINION

SWEET, District Judge.

Plaintiff Parke–Hayden, Inc. ("Parke–Hayden") has moved pursuant to Fed. R.Civ.P. 56 for an order granting summary judgment in its favor on the First Claim contained in the complaint. Defendant Loews Theatre Management Corp. ("Loews") has also moved for partial summary judgment in its favor dismissing the Third and Fourth Claims of the complaint as well as Parke–Hayden's request for punitive damages in connection with the First and Third Claims. For the following reasons, Parke–Hayden's motion is denied; Loews's motion is granted.

### The Parties

Parke–Hayden is a licensed real estate brokerage firm which is a New York corporation with its principal place of business at 98 Cutter Mill Road in Great Neck, New York.

Loews is a Delaware corporation with its principal place of business at 400 Plaza Drive in Secaucus, New Jersey. Through its subsidiary and affiliated corporations, Loews engages in the operation and management of movie theaters throughout the United States.

### The Facts

This lawsuit arises out of two unconsummated real estate transactions to which Loews was a party and in which Parke–Hayden acted as broker. With regard to both transactions, Parke–Hayden seeks to recover brokerage commissions, as well as punitive damages, from Loews.

### The 72nd Street Property

The First Claim of the Complaint, on which Parke–Hayden seeks summary judgment, involves property located at 72nd Street and Broadway in New York City (the "72nd Street Property") and negotiations by Loews to lease the 72nd Street Property and construct and operate a partially below-grade movie theater complex (the "72nd Street Transaction").

Sometime in early 1988, Hy Teich ("Teich"), the president of Parke–Hayden, brought the 72nd Street Property to the attention of Loews's employee, Gil Littman ("Littman"), Teich Dep. at 32, who had been hired by Loews in December 1987 to locate potential theater sites for Loews. Littman had started searching for a theater site in the neighborhood of West 72nd Street in early 1988. It is unclear which of the men approached the other: Littman testified that he asked Teich, a longtime friend, to find potential sites for Loews in that area, Littman Dep. at 20; Teich, on the other hand, testified that he "made someone aware ... that we had this outrageous corner. Teich Dep. at 32. In any event, Teich showed Littman the Beacon Theater and the 72nd Street Property. *Id.* at 22.

According to Littman's testimony, when Teich showed him the 72nd Street Property, Littman said "Teich, we want the deal." *Id.* at 26. Lou Korman ("Korman"), who was at all relevant times chairman of Loews's parent, Columbia Pictures Entertainment, Inc. ("Columbia"), told Littman to make the deal, and Littman called Teich and said "hey, we want the deal. Let's go." Littman Dep. at 27; *see also* Teich Dep. at 32 (Korman told Teich directly that "I'd like to get that property"). Teich conveyed Loews's interest to Philip Pilevsky ("Pilevsky"), a general partner of Broadway–72 Associates (the "Owner"), the own-

er of the 72nd Street Property. Teich reported back to Littman that Pilevsky was not interested in a transaction with Loews for that property. Littman insisted that Teich continue trying to get the 72nd Street Property. When Littman informed Korman that Pilevsky would not do the deal, Korman said that he did not care "what it takes. Make the deal. Get 72nd Street. Get Teich and make the deal." *Id.* at 27, 30. Littman thereafter had "Teich continue to work for [Loews] to get the deal" by calling him at all hours of the day and night "to make sure he understood that I wanted it." *Id.; see also* Teich Dep. at 34 (Littman told Teich to "try to get it. Try to get it.").

In his affidavit, Pilevsky states that he never asked Teich to seek a lessee for the 72nd Street Property and did not have the property listed with any broker, Pilevsky Aff. ¶ 3, and that when Teich approached him, he told Teich that he did not want to lease the property to Loews. *Id.* Subsequently, according to Pilevsky, Teich repeatedly asked him to agree to Loews's proposal. Finally, Teich persuaded Pilevsky to enter into negotiations with Loews. *Id.* ¶ 4.

Negotiations took place over approximately the next two years. During the negotiations, according to Pilevsky, Teich would often ask him to agree to points desired by Loews, and, "as a result of his efforts, agreements were reached." *Id.* ¶ 5. Indeed, Teich's role in this regard is confirmed by former Loews President and Chief Operating Officer, Jerry Esbin ("Esbin"). Esbin testified that "[h]e [Teich] would convey various things that I [Esbin] wanted to Mr. Pilevsky." Esbin Dep. at 26. The purpose of his conveying such information was "to allow [Loews] to ultimately get the deal that [Loews] wanted." *Id.* at 28. According to Littman's deposition testimony, if anything came up with respect to the 72nd Street Transaction, Esbin would say "get to Teich. Let's say some business point came up that bothered Jerry, or something. He said, get Teich and have him take care of this with Phil [Pilevsky]." Littman Dep. at 32. At the same time, Esbin's testimony clearly establishes that he regarded and understood

Teich to be acting as broker for the Owner. *See, e.g.,* Esbin Dep. at 27.

By about March 1990, Loews and the Owner reached agreement on term, rent, taxes, construction of the theater, options for additional years, air rights, changes in zoning and mortgages. Esbin Dep. at 31. Esbin testified that at that point he told Mr. Teich that there would be a deal based on everything negotiated to that point, namely, the "economic points." Esbin Dep. at 55. Esbin testified that at the time the economic points were negotiated, Loews did not take into consideration the possible results of asbestos tests or rock borings. *Id.* at 58.

After negotiations and many drafts of a lease, a "final lease" was prepared and agreed to by both parties, which, according to Parke–Hayden, was ready for execution. Pilevsky Aff. ¶ 9, Ex. A. This lease agreement, like the drafts before it, provided that Parke–Hayden was the sole broker or finder and that the Owner would pay Parke–Hayden its brokerage commission for the lease transaction. Pilevsky Aff. Ex. A ¶ 35.01. After they worked out the rent, Esbin told Teich that "with respect to those points that we have discussed the economic points, up to that point, ... everything was satisfactory to me and there would be a deal based on everything at that point." Esbin Dep. at 55.

Nevertheless, as Esbin testified, all of the points had not yet been negotiated at that time. Esbin Dep. at 54–55. Because the theater complex was to be partially below-grade, demolition of the existing building and construction of a new facility would be necessary. Loews contends that it had always conditioned its signing of the lease upon satisfactory results from soil and environmental tests at the 72nd Street Property. Thus, according to Loews, as of April 1990, the "critical point concerning the expense of excavating bedrock and removing asbestos from the property had yet to be negotiated." Loews Memo. in Opp. at 7. Loews claims that this condition was known to both Teich and the Owner as early as January 1990 when the parties began negotiating a formal agreement for

Loews to conduct the tests (the "Access Agreement"). Teich, on the other hand, testified that it was his understanding that the test results had no bearing on the parties' obligation to go forward on the deal. Teich Dep. at 118–19.

The physical due diligence revealed the presence of rock and asbestos. The estimated cost of excavation would increase the cost of the project by $800,000 to $1,000,000. Esbin informed Pilevsky that he was concerned about bearing the one million dollar cost of excavation and asbestos removal and inquired about possible concessions from the Owner. According to Pilevsky, he "immediately agreed to work that out with him.... The possible cost of the rock excavation was not a stumbling block and would not have hindered our closing this deal." Pilevsky Aff. ¶ 16; *see also* Esbin Dep. at 95. However, according to Loews, it determined that it could not accept the risk and expense involved in blasting the rock at the 72nd Street Property and decided not to go through with the transaction. *See* Benjamin 1/6/92 Aff. ¶ 3.

Meanwhile, in or about September 1989, Columbia had been taken over by Sony Corp., at which time Korman exited as Columbia's chief executive officer and Peter Guber ("Guber") and Jon Peters ("Peters") took the helm. Sometime in the end of April or beginning of May 1990, Guber and Peters replaced Bernie Myerson with Alan Friedberg ("Friedberg") as Loews's Chairman. Esbin was relieved of his position in May 1990. It is undisputed that Loews's new management terminated the 72nd Street Transaction and made no attempt to close a lease with the Owner.

### The Danbury Transaction

The Third and Fourth Claims of the Complaint, which Loews seeks to have dismissed on summary judgment, relate to a proposed joint venture agreement between Loews and real estate developers Pilevsky and David Lavipour ("Lavipour"), who formed an entity known as PL Danbury Cinemas Associates ("PL Associates"). The purpose of the proposed joint venture was to construct and operate a motion picture cinema at a site in Danbury, Connecticut (the "Danbury Transaction"). According to Parke–Hayden, Teich was retained by the proposed joint venture as a broker to facilitate the transaction. This assertion is not disputed on this motion.

Negotiations took place beginning in the spring of 1989. Loews was, and in fact continues to be, subject to a 1952 consent judgment (the "Consent Judgment") under which it is enjoined "from acquiring or continuing to own any beneficial interest in any motion picture theatre in conjunction with an actual or potential independent exhibitor." Smith 12/6/91 Aff. Ex. B, art. III, ¶ 5(b). Each draft of the proposed partnership agreement contained a clause referring to the Consent Judgment and providing that the proposed partners would not do anything to cause Loews to be in violation of the Consent Judgment. *See, e.g., id.* Ex. C, at 22–23, 44–45, 46–47.

In early 1990, Loews learned that Lavipour and Pilevsky had interests in other motion picture theaters, whereupon Loews informed all of the parties that it needed to obtain Department of Justice ("DOJ") approval for the proposed transaction. In February 1990, Loews contacted its antitrust counsel, Allen Kezsbom of Fried, Frank, Harris, Shriver & Jacobson to request that he obtain an opinion from the DOJ that the Danbury Transaction would not constitute a violation of the Consent Judgment. On March 6, 1990, Kezbom sent a letter to Frederick Haynes of the Antitrust Division of the DOJ outlining why the proposed Danbury Transaction did not violate the Consent Judgment. Kezbom subsequently forwarded to the DOJ the proposed partnership agreement and the agreements documenting the theater interests of Lavipour and Pilevsky. On April 26, 1990, Kezbom sent Haynes another letter summarizing relevant case law.

Nevertheless, Seymour Smith, who at all relevant times was Executive Vice President and General Counsel for Loews, affirms that in late September 1990, Haynes informed him and Kezsbom at a meeting at the DOJ that the DOJ would consider the consummation of the Danbury Transaction a violation of the Consent Judgment.

Smith 12/6/92 Aff. ¶ 28. On October 9, 1990, Kezsbom confirmed that Haynes had repeated this view to him. *Id.* Ex. F. Loews informed the other parties of the DOJ determination in early October 1990. Loews contends that, in view of this determination, it abandoned the Danbury Transaction. Parke–Hayden argues, on the other hand, that Loews had terminated the deal long before the DOJ determination for reasons other than any prohibitions imposed by the Consent Judgment.

*Discussion*

## I. Standard for Summary Judgment

The standard for summary judgment is well-known. As the Second Circuit has recently written:

> Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "As a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party."

*Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir.1991) (citations omitted). The court will find that there is no genuine issue of material fact and may therefore grant summary judgment where, "[v]iewing the evidence produced in the light most favorable to the nonmovant, ... a rational trier could not find for the nonmovant." *Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991); *see also Bay,* 936 F.2d at 116.

## II. Parke Hayden's Motion for Summary Judgment

The First Claim of the Complaint, on which Parke–Hayden moves for summary judgment, relates to the 72nd Street Transaction. Parke–Hayden alleges that Loews employed Parke–Hayden to procure a lease of the 72nd Street Property on its behalf, that Loews wrongfully refused to enter into the lease procured by Parke–Hayden, and that Loews is liable to Parke–Hayden in the amount of the brokerage commission Parke–Hayden would have received from the owner if not for Loews's wrongful conduct. Loews challenges Parke–Hayden's characterization of its relationship with Loews, contending that at no time did it employ Parke–Hayden as broker, that Parke Hayden was employed as Pilevsky's broker and that Loews regarded Teich as a "conduit" who was "nothing more than Pilevsky's agent and Loews' 'contact' with Pilevsky and his organization." Smith 1/6/92 Aff. ¶¶ 12–14.

It is undisputed that all parties interested in the 72nd Street Transaction contemplated that the Owner would pay Parke–Hayden's commission, as memorialized in each draft of the proposed lease agreement, *see, e.g.,* Smith 12/6/91 Aff. Ex. A, ¶ 35.01. Moreover, Parke–Hayden concedes that it has never alleged or sought to prove any agreement by Loews to pay commission to Parke–Hayden in connection with the 72nd Street Transaction. Parke–Hayden Reply Memo. at 9.

Under New York law,

> Where there is a contract of employment between the purchaser and the broker which does not expressly exclude the broker's right to commission unless the purchaser actually enters into a contract of sale, the purchaser's refusal to contract with a seller willing to contract on the purchaser's terms makes the purchaser liable to the broker for the commission the broker would have received from the seller.
>
> This liability is predicated upon the proposition that when the prospective purchaser knows that the broker will earn a commission from the seller, the law will imply a promise on the part of the prospective purchaser to complete the transaction, and if he fails or refuses to do so without a valid reason, the prospective purchaser becomes liable to the broker for breach of an implied promise, with damages chargeable to him measured by the amount of commission the broker would have earned.

*Tulp v. Padula,* 70 Misc.2d 306, 308, 333 N.Y.S.2d 3, 6 (Civ.Ct.1972); *see Westhill*

*Exports, Ltd. v. Pope,* 12 N.Y.2d 491, 496, 240 N.Y.S.2d 961, 964, 191 N.E.2d 447, 449 (1963); *Schaecter v. Regency Props., Inc.,* 115 A.D.2d 981, 981, 497 N.Y.S.2d 793, 794 (4th Dep't 1985); *Duross Co. v. Evans,* 22 A.D.2d 573, 574, 257 N.Y.S.2d 674, 676 (1st Dep't 1965); *Pease & Elliman, Inc. v. Gladwin Realty Co.,* 216 A.D. 421, 424, 215 N.Y.S. 346 (1st Dep't 1926); *McKnight v. McGuire,* 117 Misc. 306, 308, 191 N.Y.S. 323 (Sup.Ct.1921).

■ In New York, absent an agreement to the contrary, a real estate broker earns his commission when he procures a buyer who is ready, willing and able to purchase at the terms set by the seller. *Lane—Real Estate Dep't Store, Inc. v. Lawlet Corp.,* 28 N.Y.2d 36, 42, 319 N.Y.S.2d 836, 840, 268 N.E.2d 635, 638 (1971); *Kalmon Dolgin Affiliates, Inc. v. Estate of Nutman,* 172 A.D.2d 917, 568 N.Y.S.2d 204 (3d Dep't 1991).

■ For the broker to prevail therefore, it must be shown that the purchaser employed the broker, that the broker procured a seller who was ready willing and able to enter the proposed transaction, and that the failure to complete the transaction was due to the fault of the purchaser. The burden of proof is borne by the broker, in this case Parke–Hayden. *Tulp,* 70 Misc.2d at 308, 333 N.Y.S.2d at 6 (citing cases).

■ The mere fact that Parke–Hayden was to receive its commission from, and thus was employed by, the Owner, does not prevent it from also being employed by Loews. *See Grossman v. Herman,* 266 N.Y. 249, 251–52, 194 N.E. 694 (1935); *Long Island Bus. Exch., Inc. v. De Luca,* 58 A.D.2d 594, 594, 395 N.Y.S.2d 244, 246 (2d Dep't 1977); *Simon v. Allied Chem. Corp.,* 35 A.D.2d 273, 275, 315 N.Y.S.2d 919, 922 (1st Dep't 1970), *aff'd,* 29 N.Y.2d 861, 328 N.Y.S.2d 169, 278 N.E.2d 340 (1971); *Pease & Elliman,* 216 A.D. at 423,

215 N.Y.S. at 423 (quoting *McKnight,* 117 Misc. at 308, 191 N.Y.S. 323).

■ Rather, the question is whether the facts may be held as matter of law to justify an inference of a double employment. *Grossman,* 266 N.Y. at 252, 194 N.E. 694. There must be a contract between Loews and Parke–Hayden which Loews has broken with resulting liability for damages. *Id.*

> "[T]he contract of employment may be established ... by facts showing, in the absence of an express agreement, a conscious appropriation of the labors of the broker ... in some cases 'by the mere acceptance of the labors of the broker.' "

*Gronich v. 649 Broadway Equities Co.,* 169 A.D.2d 600, 565 N.Y.S.2d 18 (1st Dep't 1991) (quoting *Sibbald v. Bethlehem Iron Co.,* 83 N.Y. 378, 380–81 (1881)).

■ The affidavits and deposition testimony cited above leave no doubt that, under relevant New York law, Loews employed Teich to procure a lease of the 72nd Street Property by soliciting and accepting his services on Loews's behalf.[1] *See Tulp,* 70 Misc.2d at 309, 333 N.Y.S.2d at 7 (plaintiff-broker was "employed" by defendants—prospective purchasers of a one-family home—who had "requested" that plaintiff show them one-family houses in a certain price range in a certain area).

■ The problem on this motion for summary judgment, however, is that the record is bare of evidence of the terms of that employment other than Teich's testimony that "[m]y obligation was to try to bring— my obligation was to try to have Phil Pilevsky and his partners lease that parcel of property. My obligation to Loews was to negotiate *a palatable deal* once the plans were acceptable to both parties." *Id.* at 52–53 (emphasis added). This description of the terms is simply too indeterminate to form a basis upon which to conclude on a motion for summary judgment that Loews

---

1. The record contains evidence additional to that reviewed in the discussion of facts that establish that Teich was performing services on behalf of Loews in the 72nd Street Transaction. *See, e.g.,* Esbin Dep. at 25–28 (Teich was "performing services for Loews in this regard [help-ing Loews get the site from Pilevsky]" and Esbin understood Teich to be working for him "to the extent that he would convey what I needed to Mr. Pilevsky" for the purpose of getting the deal Loews wanted).

breached the purported agreement or "contract" with Parke–Hayden.[2]

Moreover, questions of fact exist as to whether Parke–Hayden procured a "ready, willing and able lessor" on the terms proposed by the Loews. Very specifically, the factual submissions raise a question as to whether a favorable result from the rock and asbestos tests was a condition to Loews concluding the 72nd Street Transaction which the Owner failed to meet.

Loews maintains that it had always made clear, both to Teich and Pilevsky, that favorable results from soil and environmental tests were a condition to Loews signing a final lease, while Teich testified that this was not his understanding.[3] The bulk of Loews's "evidence" of this condition or of the other parties' awareness thereof is either conclusory,[4] or fails to speak to whether the Owner or Teich were aware that these tests and/or favorable results were a condition to be met or a term to be negotiated before Loews would sign a lease.[5]

Of a more substantial nature, is Smith's affirmation regarding a January 11, 1990 meeting at Pilevsky's office at which the 72nd Street Transaction was discussed. Among those present were Smith, Pilevsky, Esbin and Teich. According to Smith, Loews's need for asbestos and subsoil testing was discussed along with other lease terms and "Pilevsky promised that *before any documents would be signed,* he would furnish Loews with a copy of an asbestos report he had prepared." Smith 1/6/92 Aff. ¶ 16 (emphasis in original). Furthermore, in a March 23, 1990 letter to Pilevsky's attorney, David Badain, Deputy General Counsel to Loews, requested execution of the Letter of Agreement for Loews to conduct its physical due diligence "as soon as possible so that we can commence our physical due diligence *and facilitate the execution of the Lease.*" Danzig 1/6/92 Aff. Ex. G (emphasis added). Finally, Esbin testified that Loews's lawyers conveyed to the landlord's lawyers that Loews wanted to do the asbestos test and the rock boring, Esbin Dep. at 58, that there were discussions "amongst ourselves only at Loews" that the "economic points" upon which all had agreed were contingent on the results of the asbestos and boring tests, and that he was "not sure" whether he told Teich that the results of the tests were a contingency to entering into the lease. Esbin Dep. at 78–79.

Drawing all inferences and resolving all ambiguities in favor of Loews, there is a material factual dispute as to whether a favorable result from the environmental tests was a term or condition unsatisfied by the Owner and thus as to whether Parke–Hayden procured for Loews a ready, willing and able lessor. *See Tulp,* 70 Misc.2d

**2.** This case should be contrasted to *McKnight v. McGuire,* 117 Misc. 306, 191 N.Y.S. 323 (Sup.Ct. 1921), in which the court held the lessee liable to the broker for breaching his agreement with the broker to enter into a lease agreement. In that case, the lessee had employed the broker to submit an offer to the owner of the premises, had agreed to lease the premises if the broker could obtain specific terms (which the broker ultimately did), and knew that the broker anticipated receiving a commission from the owner. *Id.* at 307–09, 191 N.Y.S. 323; *see also Westhill Exports,* 12 N.Y.2d at 494, 240 N.Y.S.2d at 962–63, 191 N.E.2d at 448 (broker authorized to negotiate for paper supply contract; price, term, quantity and quality terms of desired contract specified); *Julien J. Studley, Inc. v. New York News, Inc.,* 122 A.D.2d 633, 635, 505 N.Y.S.2d 419, 420 (1st Dep't 1986) (no implied-in-fact contract where defendant-seller never specified asking price), *aff'd,* 70 N.Y.2d 628, 518 N.Y.S.2d 779, 512 N.E.2d 300 (1987).

**3.** Teich testified that rent and air rights were a topic of hot negotiation. Teich Dep. at 44–46.

Unfortunately, the pages of the Teich deposition transcript which presumably contain Teich's response when asked what other issues were subject to negotiation have been omitted. Parke–Hayden Notice of Motion, Teich Dep. at 46–?.

**4.** *See, e.g.,* Smith 1/6/92 Aff. ¶¶ 16–19 ("This fact [that favorable results was a condition] was no secret to Pilevsky or Teich. In fact, Loews' intentions in this regard were made known to Pilevsky and Teich as early as January of 1990. . . ."); *id.* at 21 ("As both Pilevsky and plaintiff were well aware, that [determining whether Loews should enter into the lease] was the precise purpose of conducting these due diligence environmental tests *before* Loews would sign the lease." (emphasis in original)).

**5.** *See, e.g.,* Smith 1/6/92 Aff. ¶ 19, stating merely that "the *importance* of the soil and environmental tests was continuously reiterated." (emphasis added).

at 310, 333 N.Y.S.2d at 8 (plaintiff not entitled to commission where failed to prove he had procured seller ready, willing and able to sell on defendants' terms); *cf. Sanders A. Kahn, Assocs. v. Maidman,* 69 Misc.2d 90, 93, 329 N.Y.S.2d 121, 124 (Sup. Ct.1971) ("Where the owner merely specifies the purchase price of property, without fixing the other terms of sale, commissions are not earned until and unless the person produced by the broker reaches an agreement with the owner not only as to price but also as to the terms upon which the sale is to be made."), *aff'd,* 38 A.D.2d 798, 329 N.Y.S.2d 318 (1st Dep't), *aff'd,* 30 N.Y.2d 831, 335 N.Y.S.2d 77, 286 N.E.2d 462 (1972).

■ Parke–Hayden contends, nevertheless, that Loews is liable for its commission regardless of any unfulfilled condition because the failure of the condition was due to the bad faith repudiation of the deal as part of a house-cleaning by the Loews management team that took over in the late spring of 1990. Under New York law, regardless of unfulfilled terms or conditions, the party who employs the broker will be liable for the commission if he is responsible for the failure to perform the condition. *Nuvest, S.A. v. Gulf & Western Indus., Inc.,* 649 F.2d 943 (2d Cir.1981) (citing *Lane,* 28 N.Y.2d at 43, 319 N.Y.S.2d at 841, 268 N.E.2d at 639); *Collins Tuttle & Co. v. Ausnit,* 95 A.D.2d 668, 669, 463 N.Y.S.2d 219 (1st Dep't 1983) (" 'a defendant who is sued for a commission cannot be heard to complain where it was her own act which prevented the natural progress of the transaction' " (quoting *Trylon Realty Corp. v. Di Martini,* 40 A.D.2d 1029,

1030, 338 N.Y.S.2d 945 (2d Dep't 1972), *aff'd,* 34 N.Y.2d 899, 359 N.Y.S.2d 284, 316 N.E.2d 718 (1974)). In other words, if the sale is not consummated due to the bad faith, wrongful or arbitrary conduct by the party who retained the broker, that party may not avoid his liability to the broker under their agreement.[6]

While Parke–Hayden has presented evidence suggesting that the demise of the 72nd Street Transaction may have been due to the mere unwillingness of the new management team to proceed even on the terms to which all of the parties had already agreed,[7] there are questions of fact as to whether the cost of the rock and asbestos removal was a genuine deal-stopper.[8] There is no proof, for instance, that Pilevsky indeed would have "worked out" issues regarding the cost of the removal within the terms undisputedly satisfactory to Loews. Because factual questions exist as to these issues, Parke–Hayden's motion for summary judgment on the First Claim is denied.

### III. Loews's Motion for Partial Summary Judgment

#### A. *Motion to Dismiss Third and Fourth Claims Based on the Danbury Transaction*

■ The first half of Loews's motion for summary judgment seeks dismissal of the Third and Fourth Claims, in which Parke–Hayden claims lost brokerage commissions relating to the Danbury Transaction. Unlike the dispute relating to the 72nd Street Property, Loews does not contest Parke–Hayden's allegation that it was acting as

---

6. Loews contests the availability of this theory to Parke–Hayden in the first instance, claiming that it applies only where the party allegedly acting in bad faith employed the broker. As discussed above, Parke–Hayden was employed by Loews.

7. Esbin and Pilevsky both testified that when Esbin approached Pilevsky about the potential added cost of the asbestos and rock excavation, Pilevsky indicated a willingness to negotiate concessions, stating that they would "work something out." Esbin Dep. at 95; Pilevsky Aff. ¶¶ 16–17. Nevertheless, this possibility was never pursued by Loews's new management, and

the record establishes that it opted not to proceed with the deal because it was "financially unsound." Friedberg Aff. ¶¶ 2, 5–6. Thus, there is "testimony from which the jury could ... conclude[ ] that [the Owner] might have met [Loews's] price term" if Loews had negotiated the concessions further. *Nuvest,* 649 F.2d at 949.

8. Kenneth Benjamin, a Vice President of Loews since May 1989, states in his affirmation that, as of April 1990, the discovery of rock posed a "major problem in going forward with the proposed transaction." Benjamin Aff. ¶ 3.

Loews's broker in the Danbury Transaction. Rather, Loews contends that because the Consent Judgment prohibited the joint venture between Loews and PL Associates, Parke–Hayden did not secure ready, willing and able partners for the proposed joint venture. As such, Loews argues that Parke–Hayden is not entitled to a commission as a matter of New York law. *See, e.g., Lane,* 28 N.Y.2d at 42, 319 N.Y.S.2d at 840, 268 N.E.2d at 639.

Parke–Hayden opposes Loews's motion contending first that Loews cannot raise the Consent Judgment as a shield because it was within Loews's power to have the prohibition lifted, enabling it to consummate the Danbury Transaction. Secondly, Parke–Hayden contends that the Consent Judgment was not the real reason for Loews's decision to back out of the deal.

There is no dispute concerning the awareness of the parties that compliance with the Consent Order was a term of the transaction. Each draft of the proposed partnership agreement contained provisions stating that PL Associates had been alerted to the existence of the Consent Judgment, had been advised that it prohibited Loews "from acquiring or continuing to own any beneficial interest in any motion picture theatre in conjunction with an actual or potential independent exhibitor," and had agreed "not to do or perform any act ... which would cause Loews ... to be in violation of said provision...." *See* Smith 12/6/91 Aff. Ex. C, at 45–46. There is also no dispute that Loews sought an opinion from the DOJ as to whether the Danbury Transaction would violate the Consent Order and that the DOJ advised Loews in September 1990 that it would view the transaction as violative. Nevertheless, Parke–Hayden argues that Loews's motion should be denied, asserting that Loews could have had the Consent Judgment lifted but failed to take any steps to do so. *See* Parke–Hayden Memo. in Opp. at 5 ("Loews had but to ask the Department of Justice that it consent to the elimination of the decree.").

Parke–Hayden's assertion that the Consent Judgment would have been lifted had Loews made the effort is not supported by facts. Concededly, the DOJ did submit a memorandum in support of Loews October 1990 motion to lift the decree. Nevertheless, even to this date, no evidence has been presented that that motion was successful. Thus, even if Loews had taken action during the pendency of negotiations with PL Associates, there is no factual basis for Parke–Hayden's facile contention that Loews would have been freed of the constraints imposed by the Consent Judgment. As things stood at the time of the negotiations, and indeed, as they still stand today, Loews was subject to the Consent Judgment which, according to the DOJ, prohibits a joint venture with PL Associates.

Moreover, even assuming that Loews could have had the Consent Judgment eradicated by merely lifting its finger, this is not material to the inquiry as to whether Parke–Hayden procured ready, willing and able partners under the terms of the proposed partnership. Loews never agreed, nor was it a condition of any agreement with PL Associates or Parke–Hayden, that Loews would make any efforts to have the Consent Judgment lifted. To the contrary, the proposed partnership agreements clearly contemplated the existence and survival of the Consent Judgment. Thus, this case is distinguishable from *Long Island Bus. Exch. v. De Luca,* 58 A.D.2d 594, 395 N.Y.S.2d 244 (2d Dep't 1977), invoked by Parke–Hayden. In that case, a condition of the proposed agreement was that the defendant would obtain a liquor license within eight weeks. Because the defendant allegedly failed to apply timely for the license, the court held that the plaintiff had stated a cause of action for its commission because the defendant allegedly acted deliberately to cause the transaction to founder. *Id.* at 594, 395 N.Y.S.2d at 245.

Parke–Hayden also claims that the Consent Judgment had nothing to do with the failure of the transaction because Loews terminated the transaction long before it received the DOJ's opinion in September 1990. Even assuming the truth of the assertion that the Consent Judgment was not the primary *reason* for Loews's decision to

terminate the transaction, the fact remains that the Consent Judgment existed at all times and legally prevented Loews from being "able" to participate in this joint venture.

Because the undisputed facts establish that Parke–Hayden failed to procure ready, willing and able partners for the Danbury joint venture, Loews's motion for summary judgment dismissing the Third and Fourth Claims is granted.

### B. *Motion to Dismiss Parke–Hayden's Claim for Punitive Damages*

Loews also has moved for summary judgment dismissing Parke–Hayden's claim for punitive damages on the First and Third Claims.

 As a preliminary matter, it bears noting that, even assuming Loews's bad faith, these claims sound in contract, not tort. *Pittston Warehouse Corp. v. American Motorists Ins. Co.*, 715 F.Supp. 1221, 1227 (S.D.N.Y.1989) ("tort of bad faith breach of contract" except in the insurance context), *aff'd* 954 F.2d 62 (2d Cir.1992). Under New York law, punitive damages generally are not available for a simple breach of contract. *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 371 (2d Cir.1988) (citing New York cases). New York courts, the Second Circuit and courts within this district are virtually unanimous that punitive damages may not be awarded in breach of contract cases, unless the wrong is aimed at the public generally. *Durham Indus., Inc. v. North River Ins. Co.*, 673 F.2d 37, 41 (2d Cir.), *cert. denied*, 459 U.S. 827, 103 S.Ct. 61, 74 L.Ed.2d 64 (1982); *Airlines Reporting Corp. v. Aero Voyagers, Inc.*, 721 F.Supp. 579, 585 (S.D.N.Y.1989) (punitive damages available in breach of contract actions where "fraud '*aimed at the public generally*,' evincing a 'high degree of moral turpitude,' and demonstrating 'such wanton dishonesty as to imply a criminal indifference to civil obli-

gations.' " (citation omitted; emphasis added)); *Morse/Diesel, Inc. v. Fidelity & Deposit Co.*, 715 F.Supp. 578 (S.D.N.Y. 1989) (punitive damages based on a contractual action cannot be sought absent some allegation of wrong against public generally); *Purdy v. Consumers Distrib. Co.*, 648 F.Supp. 980, 983 (S.D.N.Y.1986) ("[P]unitive damages are not available unless the plaintiff can show that the conduct complained of was not an isolated private wrong, but rather a morally culpable course of conduct *aimed at injuring the public generally*." (emphasis added)); *Jacobson v. New York Prop. Ins. Underwriting Assoc.*, 120 A.D.2d 433, 501 N.Y.S.2d 882 (1st Dep't 1986) (to state cause of action for punitive damages, pleader must assert " 'not an isolated transaction incident to an otherwise legitimate business, but a gross and wanton fraud *upon the public*.' " (emphasis added; quoting *Walker v. Sheldon*, 10 N.Y.2d 401, 406, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961)); *Samovar of Russia Jewelry Antique Corp. v. Generali*, 102 A.D.2d 279, 281, 476 N.Y.S.2d 869, 871 (1st Dep't 1984) (must be "morally reprehensible conduct *directed at the general public*" (emphasis added)).

Citing a handful of cases, Parke–Hayden argues that a wrong against the general public is not a required element of a claim for punitive damages in breach of contract actions in New York. However, the two cases that are arguably on point, *Williamson, Picket, Gross, Inc. v. Hirschfeld*, 92 A.D.2d 289, 460 N.Y.S.2d 36 (1st Dep't 1983) and *AML Int'l Ltd. v. Orion Pictures Corp.*, No. 89 Civ. 2048 (KMW), 1991 WL 120323, 1991 U.S.Dist.Lexis 842 (S.D.N.Y. June 21, 1991), run decidedly against the grain of prevailing New York law.[9]

In *Williamson, Picket*, an action for breach of a brokerage agreement, the First Department held that punitive damages may be awarded where the defendant's conduct involves "that degree of bad faith

---

9. The other cases cited by Parke–Hayden are distinguishable in that they did not involve simple breaches of contract. *See Gordon v. Nationwide Mut. Ins. Co.*, 30 N.Y.2d 427, 334 N.Y.S.2d 601, 285 N.E.2d 849 (1972) (insurance contract), *cert. denied*, 410 U.S. 931, 93 S.Ct. 1374, 35 L.Ed.2d 593 (1973); *Minjak Co. v. Randolph*, 140 A.D.2d 245, 528 N.Y.S.2d 554 (1st Dep't 1988) (breach of warranty of habitability).

1268

evincing a 'disingenuous or dishonest failure to carry out a contract.'" 92 A.D.2d at 295, 460 N.Y.S.2d at 41 (quoting *Gordon v. Nationwide Mut. Ins. Co.*, 30 N.Y.2d 427, 437, 334 N.Y.S.2d 601, 285 N.E.2d 849 (1972)). However, the First Department appears to have abandoned the holding of *Williamson, Picket.* In *Jacobson v. New York Property Ins. Underwriting Ass'n.*, 120 A.D.2d 433, 501 N.Y.S.2d 882 (1986), the same court explicitly held three years later that punitive damages are available in breach of contract actions only if the allegations support a conclusion that a fraud "upon the public" is involved. *Id.* at 435, 501 N.Y.S.2d at 884. And, after engaging in a detailed analysis of New York law on this topic, a court within this district rejected the rule in *Williamson, Picket* as an "aberration" in the otherwise uniform law of New York. *Purdy*, 648 F.Supp. at 982-83; *cf. Morse/Diesel*, 715 F.Supp. at 588 (breach of contract action; rejecting application of *Greenspan v. Commercial Ins. Co.*, 57 A.D.2d 387, 395 N.Y.S.2d 519 (1977), which held that *Walker* is no longer valid in New York). Indeed, the *Williamson, Picket* court itself acknowledged the prevailing New York rule that "'punitive damages are not available for mere breach of contract, for in such a case only a private wrong, and not a public right, is involved.'" 92 A.D.2d at 294, 460 N.Y.S.2d at 40 (quoting *Garrity v. Lyle Stuart, Inc.*, 40 N.Y.2d 354, 358, 386 N.Y.S.2d 831, 833, 353 N.E.2d 793, 795 (1976)).

In the second case, *AML International,* Judge Wood recently denied a motion for summary judgment to strike plaintiff's demand for punitive damages in a breach of contract action. The court stated that "[u]nder New York law, punitive damages will be available only where defendant's conduct constitutes 'gross, wanton, or willful fraud or other morally culpable conduct.'" 1991 WL 120323 at 4, 1991 U.S.Dist.Lexis at 11 (quoting *Smith*, 861 F.2d at 371-72; *Borkowski v. Borkowski*, 39 N.Y.2d 982, 387 N.Y.S.2d 233, 355 N.E.2d 287 (1976)). Nevertheless, this definition of New York law must be read before the backdrop of Judge Wood's prior opinion in the same case in which she wrote:

According to the law of New York, ... "'punitive damages are not available for mere breach of contract' ... even if the breach results from a deliberate breach of good faith." To award punitive damages, "[t]here must be fraud *'aimed at the public generally,'* evincing a 'high degree of moral turpitude,' and demonstrating 'such wanton dishonesty as to imply a criminal indifference to civil obligations.'"

*AML Int'l Ltd. v. Orion Pictures Corp.*, No. 89 Civ. 2048 (KMW) 1990 WL 364469, slip op. at 2 (emphasis added). *AML* is further distinguishable in that it involved an allegation of a pattern of breached contracts against various parties.

Following prevailing New York law, therefore, Parke–Hayden may not claim punitive damages for Loews's alleged breach of contract in the 72nd Street and Danbury Transactions. Loews's motion for summary judgment dismissing such claims is granted.

*Conclusion*

For the foregoing reasons, Parke–Hayden's motion for an order granting summary judgment in its favor on the First Claim is denied. Loews's motion for summary judgment dismissing the Third and Fourth Claims, as well as Parke–Hayden's claim for punitive damages on the First and Third Claims is granted.

It is so ordered.