**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Charles H. KERKMAN,
Defendant–Appellant.**

No. 87–1106.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 12, 1988.

Decided Jan. 31, 1989.

Rehearing and Rehearing En Banc
Denied March 17, 1989.

H. Fred Hoefle, argued, Cincinnati, Ohio, for defendant-appellant.

Tom Gezon, Asst. U.S. Atty., argued, Grand Rapids, Mich., for plaintiff-appellee.

Before KENNEDY, MARTIN and NORRIS, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

Charles Kerkman appeals convictions against him for mail fraud and conspiracy. Kerkman contends his conviction was premised upon the "intangible rights" theory prohibited by the Supreme Court in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). He also attacks his convictions because of alleged insufficiency of evidence, an evidentiary ruling, ineffective assistance of counsel, and the interrogation of a witness by the trial judge. Finally, Kerkman challenges the validity of his conviction for

conspiracy under 18 U.S.C. § 371 arguing that the indictment was impermissibly void for vagueness. We find that Kerkman's arguments are without merit and so affirm his convictions.

In 1979 Robert Fischl and Kerkman organized two corporations, Lake Link Transportation Company and Upper Peninsula Shipbuilding Company. Both men were officers of the corporations. The men negotiated a $35.5 million contract with the Michigan Department of Transportation for the construction by Upper Peninsula of a tug boat and four barges. That contract called for an advance of $3.5 million by October 1, 1979. As part of this advance the state agreed that it would deliver a check payable to Upper Peninsula in the amount of $1 million to Fischl on July 3, 1979, the day the contract was to be signed. Five days prior to signing the contract, Fischl gave the Department of Transportation a letter requesting the $1 million advance. Attached to the letter was a purported quote from MaK Machinenbau, a German manufacturer of boat engines, claiming that it needed a 20% down payment for engines. That quote was an apparent forgery since it seems MaK's original quote requested a 10% down payment.

Meanwhile, Kerkman flew to West Germany to close the deal for the engines with MaK. During negotiations, Kerkman solicited money from Geunter Kuehl, a representative of MaK. Kerkman said he needed the money to fund his new companies. They agreed to give Kerkman 425,136 Deutschmarks and to add this amount to the engine order. Thus, the final purchase price of the engines was 3,985,136 Deutschmarks, which included the 425,136 Deutschmarks requested by Kerkman.

The contract between Upper Peninsula and Michigan was signed and the $1 million was advanced. Of the $1 million he received from the state, Fischl transferred 781,136 Deutschmarks to MaK. After MaK received this amount as down payment it issued two checks totalling the 425,136 Deutschmarks requested by Kerkman. One check was made out to Lake Link Transportation for 405,136 Deutsch-marks, and the balance of 20,000 Deutschmarks was made out to Kerkman.

Kerkman returned to the United States and gave the larger check to Fischl who deposited it into a Lake Link bank account. The remaining 20,000 Deutschmarks was ultimately deposited in a Lake Link account despite the fact the contract was with Upper Peninsula and not Lake Link. Most of this money was eventually used to purchase vessel drawings for Lake Link and Upper Peninsula. The plans were a valuable asset which Kerkman and Fischl's young companies needed for this and future ventures.

The contract between Upper Peninsula and the state contained a conflict of interest clause that prohibited it from entering into any contract or subcontract "in which any member, officer, or employee of [Upper Peninsula] during their tenure or for one (1) year thereafter has any interest, direct or indirect." The contract contained a termination clause giving the state the right to terminate the contract in the event of a substantial violation of this or any other term of the contract. The contract also made the state's initial $3.5 million advance payment contingent upon Upper Peninsula's providing the state with "details of ... direct or indirect construction expenditures and commitments made through the approximate date of the advance payment." The contract also required Upper Peninsula to support these details "by sufficient documentation to demonstrate that actual expenditures and commitments are, at least, equal to the amount of the advance."

Before Michigan paid the balance of the $3.5 million advance to Upper Peninsula it requested a brief outline of expenditures incurred. Upper Peninsula submitted an outline to the state on September 11, 1979, and invoiced the state for the remaining $2.5 million due under the agreement. The invoice was supported by documentation that included a "schedule of expenditures" on which $428,250 (781,136 Deutschmarks) was listed as "direct expenditures" for "engines." The documentation also included a

letter from MaK to Upper Peninsula auditors which confirmed that Upper Peninsula had a contract for the purchase of engines at a total price of $2,253,897.81 on which MaK had received a down payment of $428,257.81. The text of the letter had been furnished to MaK by Fischl. The net down payment retained by MaK was in fact less than half the amount claimed in the letter, and the true price to Upper Peninsula was some $233,000 less than the amount it was asserted to be.

The state was not satisfied with the outline and so sent its own auditors to review the documents with Fischl. The purpose of that visit was to examine expenditures to insure that they totaled $1 million. The state auditor concluded that Upper Peninsula's expenditures did exceed $1 million by $25,945.33. The auditor found no unusual payments made by Upper Peninsula that could be considered questionable. However, Fischl did not tell him that any money had been received back from MaK. Moreover, the auditor was told that Kerkman was not a U.S. representative of MaK. Following the auditor's visit with Fischl, the state paid Upper Peninsula the remaining $2.5 million of the $3.5 million advance.

In 1981 Kerkman admitted he had solicited and later received money from MaK. He argued, however, that it was not a kickback. At trial, an IRS witness testified that had the facts of the kickback been revealed and handled properly on tax returns, the kickback should have been reported by Kerkman on his 1979 personal return, which would have resulted in a substantial tax liability.

After expending approximately $40 million of the state's money, Upper Peninsula went bankrupt, never having completed the tug boat nor even a single barge. Kerkman and Fischl were indicted on January 30, 1984. A joint trial was begun on August 20, 1984. After the government rested its case, Fischl called no witnesses. The district court adjourned the trial of Kerkman and sent the case to the jury on Fischl because he had rested. The jury convicted Fischl of 5 counts, which conviction was affirmed by this court. *United States v. Fischl*, 797 F.2d 306 (6th Cir.1986). At a subsequent trial of Kerkman, a jury returned a verdict of guilty on 7 counts of the indictment.

The only issue of any merit before this court is Kerkman's *McNally* challenge to his convictions. In *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court held that the mail fraud statute, 18 U.S.C. § 1341, applies only to schemes or artifices which defraud or attempt to defraud someone or something of money or property. *McNally* held that the mail fraud statute was inapplicable to schemes designed to defraud "people or the government of intangible rights, such as the right to have public officials perform their duties honestly." *Id.* 483 U.S. at ——, 107 S.Ct. at 2880, 97 L.Ed.2d at 301. Property rights, however, include both tangible and intangible property rights, such as a corporation's confidential information. *Carpenter v. United States*, 484 U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987).

Kerkman argues that his convictions for mail fraud, wire fraud and conspiracy to defraud should be reversed as a result of *McNally*. This reliance on *McNally* is misplaced. In determining whether a conviction will be upheld after *McNally*, we "must look to the substantive allegations of the indictment and the jury instructions to determine whether the conduct alleged and necessarily found to have occurred by the jury constituted an offense." *United States v. Horton*, 847 F.2d 313, 321 (6th Cir.1988). The pertinent portion of the indictment here charging Kerkman with mail and wire fraud provides that he "devised and intended to devise a scheme and artifice to defraud the state of Michigan, its citizens and taxpayers and to obtain and attempt to obtain money by means of false and fraudulent pretenses, representations and promises." Similarly portions of the jury instructions refer to the "causing [of] some financial loss to another or bringing

about some financial gain to oneself" and to inducing "someone to part with property or to surrender some legal right." This language is sufficiently clear to indicate that Kerkman's convictions were not based on an intangible rights theory.

Kerkman argues that even if an intangible rights theory was not a part of the indictment, the government's theory of the case and the evidence adduced to prove a scheme to defraud Michigan still do not constitute a crime after *McNally*. He contends that the government's theory was that Michigan was denied access to information and that Michigan's right to information is not a property right under *McNally*. Kerkman argues that the jury could not have found the deprivation of any money or property because the Michigan Department of Transportation awarded a fixed price contract. Kerkman asserts that under this contract Upper Peninsula was entitled to $35.5 million, so long as it completed the barges. Therefore, the kickback cost Michigan nothing. Moreover, Kerkman argues that by hiding the kickback Michigan was deprived of only an intangible right to information.

This argument is without merit. In *United States v. Fagan*, 821 F.2d 1002, 1009 (5th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988), a case decided after and in light of *McNally*, the Fifth Circuit concluded that section 1341 protects "economically material information" which an employee has reason to believe "would lead a reasonable employer to change its business conduct."

In *Fagan*, the defendant had paid kickbacks to officials of the Texoma Production Company in return for the opportunity to lease the company boats. The defendant argued that the kickbacks had not harmed Texoma, but had simply reduced the defendant's own profits. The court rejected this argument finding that Texoma had been deprived of economically material information. The court reasoned that had Texoma known about the kickbacks it might have concluded that it could have leased for less elsewhere. The court also found that the scheme in this case fell squarely within the ambit of section 1341 as described by *McNally*. In *Fagan* the scheme "was one to deprive Texoma of its property rights, *viz.* its control over its money, as it parted with its rental payments on the basis of a false premise." *Id.* at 1011 n. 6.

Similarly, knowledge of the MaK kickbacks was "economically material information" which might have induced the Michigan Department of Transportation "to change its business conduct." By hiding the kickback, Kerkman led the Department of Transportation to part with "its control over its money ... on the basis of a false premise" in several ways.

First, a reasonable jury could have found that Kerkman and Fischl obtained the first $1 million of the advance under false pretenses by misrepresenting the amount of the engine down payment. The contract called for an advance of $3.5 million by October 1, 1979. The Department of Transportation had agreed, however, to make $1 million available on July 3, 1979. It was led to believe that the money would be used for engine downpayments and administrative expenses. Instead, Kerkman and Fischl diverted a portion of the money to purchase a valuable asset, vessel plans, for Lake Link and Upper Peninsula. Consequently, Kerkman and Fischl gained an important future economic advantage since future tugs would require use of the same plans. A reasonable jury could have found that Kerkman and Fischl misrepresented the amount of the downpayment in order to divert a portion of the advance to purchase this valuable asset for their companies. The Department of Transportation was thus deprived of a valuable property interest, namely, the use of $1 million for two months.

Kerkman and Fischl also arguably obtained the $2.5 million balance of the advance under false pretenses. They knew that the Department of Transportation was concerned about conflicts of interest. They

also knew that under the terms of the contract disclosure of the kickback would entitle the Department of Transportation to cease payment of the advance and terminate the contract. When the Department of Transportation conducted an audit of Upper Peninsula prior to payment of the balance of the advance, Kerkman deprived it of economically material information about the kickback. A reasonable jury could have concluded that Michigan would not have parted with its $2.5 million had Kerkman not deceived the Department of Transportation.

In light of the facts of this case and the analysis provided by *Fagan*, it is clear that Kerkman's conviction was within the requirements established by *McNally*.

Kerkman's other arguments are wholly without merit. The evidence established was clearly sufficient to convict Kerkman of fraud and conspiracy. The district court's questioning of Mark Hoffman, comptroller of Lake Link and Upper Peninsula, was proper under *United States v. Hickman*, 592 F.2d 931 (6th Cir.1979). The record reveals neither a lack of objectivity nor plain error on the part of the district court judge. Furthermore, that the district court allowed the former testimony of Guenter Kuehl to be read at trial was proper under Fed.R.Evid. 804. Finally, Kerkman's arguments that he was denied effective assistance of counsel and that count 10 of the indictment was impermissibly vague are specious.

Kerkman's conviction is affirmed in its entirety.