**UNITED STATES of America, Appellee,**

v.

**Melvin MILLER and Jay Adolf, Defendants–Appellants.**

Nos. 388, 389, Dockets 92–1239, 92–1260.

United States Court of Appeals, Second Circuit.

Argued Nov. 12, 1992.

Decided June 24, 1993.

Gerald B. Lefcourt, New York City (John C. Coffee, Jr., Joshua L. Dratel, Sheryl E. Reich, of counsel), for defendant-appellant Melvin Miller.

Paul F. Corcoran, Oyster Bay, NY, for defendant-appellant Jay Adolf.

Matthew E. Fishbein, Asst. U.S. Atty. for the E.D. of N.Y., Brooklyn, NY (Andrew J. Maloney, U.S. Atty. for the E.D. of N.Y., David C. James, Susan Corkery, Asst. U.S. Attys. for the E.D. of N.Y., of counsel), for appellee.

Before: NEWMAN, CARDAMONE, and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

Defendants-appellants Melvin Miller and Jay Adolf appeal from judgments of conviction entered April 20, 1992 in the United States District Court for the Eastern District of New York, Raymond J. Dearie, *Judge,* after a jury convicted them of six counts of mail fraud in violation of 18 U.S.C. § 1341 (1982); one count of using a false, fictitious, and assumed name for the purpose of conducting a mail fraud in violation of 18 U.S.C. § 1342 (1982); and one count of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371 (1982). Appellants contend that the acts with which they were charged did not constitute criminal violations proscribed by the mail fraud statute because they did not involve the obtention of "money or property" by fraud within the meaning of § 1341.

We agree, and reverse the convictions.

### Background

Miller and Adolf were attorneys practicing in partnership together as "Adolf & Miller." Miller was also a member of the New York State General Assembly, and had served since 1987 as Speaker of the Assembly. Adolf was counsel to the Speaker, both during Miller's tenure and those of Miller's two predecessors.

In 1983, Miller and Adolf were retained by tenants of the Philip Howard Apartments (the "Philip Howard"), an apartment complex of approximately 640 units located at 1655 Flatbush Avenue, Brooklyn, New York, to represent them in negotiations with Tiara Realty Company ("Tiara"), the owner of the complex, concerning a proposed conversion of the Philip Howard from rental units to cooperative apartments. The conversion plan proposed by Tiara (the "Plan") was a "non-eviction" plan, under which tenants who elected not to purchase their units could remain as lessees while the landlord would remain the owner of their units. The landlord would also be free to resell these units to outside purchasers. The owners of those "occupied" apartments would receive rent from those tenants under the governing leases, but would be bound by the terms of the leases as well as any applicable rent control or rent stabilization regulations. Once a tenant vacated an occupied apartment, however, the owner would be free to sell it on the open market.

In a cooperative apartment, purchasers acquire shares of the corporation that owns the apartment building. The number of shares attributable to a given apartment derives from the size and location of the apartment, as well as any special features, such as a terrace. In order for the Plan to be declared effective under New York law and the conversion to go forward, at least fifteen percent of the tenants had to agree to purchase their apartments. To help meet this requirement, Tiara offered tenants the opportunity to purchase their units at a reduced "insider" price. This insider price was nominally $67.50 per share, but included credits for apartment improvements that resulted in an effective price of approximately $61.00 per share. From September 1983 to the summer of 1984, Miller and Adolf negotiated the insider price with Tiara on behalf of the tenants of the Philip Howard.

Isaac Rokowsky was a principal of Tiara. Aviezer Cohen was employed by Tiara as manager of the Philip Howard. Meyer Rosenbaum was a New Jersey nursing home operator and real estate investor. Rosenbaum and Cohen were acquainted with one another, as well as with Miller, as a result of previous dealings in real estate investments.

During the conversion process, Cohen advised Rosenbaum that a number of Philip Howard apartments were potentially available for sale to third parties under the terms of the Plan. Rosenbaum viewed the opportunity favorably, and assembled a group of like-minded private investors (the "Group") to consider the possibility of purchasing a number of units for resale. Cohen subsequently informed Miller that Rosenbaum headed this Group, and that the Group was interested in investing in the Philip Howard. After completing their representation of the Philip Howard tenants, Miller and Adolf agreed to represent the Group in connection with the purchase of apartments in the Philip Howard.

Rokowsky testified that Miller stated to him that the Group was interested in pur-

chasing "maybe $2 million" worth of occupied apartments. Occupied apartments were less costly than vacant apartments because, as previously indicated, occupied apartments were subject to lease and rent regulation restrictions and could not be immediately resold. Ultimately, however, the Group decided to invest in both occupied and vacant apartments.

Rosenbaum testified that he raised $2.3 million from the Group, but believed that upon his recommendation, the Group would have contributed an additional $200,000 to $300,000 to purchase additional units. At trial, however, Rosenbaum could not recall communicating this possibility directly to Miller or to Adolf. Rosenbaum testified that after an initial conversation with Miller confirming Miller's representation of the Group, Rosenbaum instructed Miller to channel all further communications with Rosenbaum through Cohen.

As manager of the Philip Howard, Cohen was familiar with the size, layout, and features of many of the apartments in the complex, and was aware of when occupied apartments might become vacant. Based significantly upon Cohen's knowledge of which units were the most desirable, Miller negotiated the sale by Tiara of 122 apartments, ninety of which were occupied and thirty-two of which were vacant.

Miller and Adolf's fee from the Group was based upon the difference between the price that the Group was willing to pay for shares of occupied apartments and the price at which Tiara agreed to sell. No commission was to be paid on shares for vacant apartments, the price for which was negotiated to be $110.00 per share. After discussions with Cohen, Rosenbaum agreed to pay $71.00 per share for occupied apartments. This decision was informed, at least in part, by Rosenbaum's estimation of an insider selling price of $67.00–$68.00, although Rosenbaum testified that the size of Miller and Adolf's fee was immaterial to him.

This fee arrangement was memorialized by an agreement executed by the firm Adolf & Miller, Rosenbaum, and Cohen (the "Fee Agreement") on November 5, 1984, which provided:

The undersigned nominees [Rosenbaum and Cohen] for the purchasers of shares of stock representing 90 occupied apartments in the Philip Howard Apartments, Brooklyn, New York acknowledge that they have agreed to pay $71.00 per share for said shares and agree and acknowledge that the differential of any price below $71.00 per share will be retained by Adolf & Miller, 220 East 42nd Street New York City as their total brokerage and legal fees in connection with this transaction or such fees will be paid by the seller; Adolf & Miller agrees to represent purchasers in the future sales of individual apartments at a fee of $300.00 per sale.

The Fee Agreement was apparently the only documentation of the relationship between Miller, Adolf, and the Group.

Under the Fee Agreement, Miller and Adolf anticipated a fee of approximately $10.00 per (occupied apartment) share conveyed to the Group. In the aggregate, this fee amounted to approximately $238,000. Unbeknownst to Rosenbaum, Miller and Adolf had agreed that Cohen would receive as a "finder's fee" fifty percent of any fee earned by Miller and Adolf from the Group. Similarly, unbeknownst to Miller and Adolf, Cohen had an agreement with Rosenbaum to share fifty percent of any profits Rosenbaum received from the Group's eventual resale of the apartments.

Cohen testified that shortly after Tiara agreed to sell the 122 units, he suggested that Miller, Adolf, and he invest their anticipated fee in a number of the apartments that Tiara was willing to sell. On November 2, 1984, Miller wrote Cohen a letter that stated the terms of his agreement with Tiara and enclosed a schedule of the 122 apartments that Tiara had agreed to sell. In the letter, Miller stated: "We must decide which of the ap[a]rtments are going to the [G]roup and which you will reserve for personal purchase."

At trial, the parties disputed the meaning of the reference to "personal purchase." Cohen testified that the expression referred to Miller and Adolf as well as Cohen. Miller testified that at that juncture, Cohen was

investing on his own behalf (perhaps in conjunction with others unknown to Miller) and not with Miller and Adolf. Miller further testified that he and Adolf did not agree to invest in the units that Cohen selected for "personal purchase" until late December 1984 or early January 1985. In any event, Cohen selected seven vacant apartments (including a furnished "model" apartment) noteworthy for their attractive features, such as terraces or views, and one occupied apartment that was about to become vacant.

At Miller's direction, an initial draft of a subscription agreement that covered all 122 apartments was revised and redrafted into two separate subscription agreements: one for the eight apartments (the "Apartments") designated by Cohen (the "Cohen Agreement"), the other for the remaining 114 apartments (the "Rosenbaum Agreement"). The Cohen Agreement covered 456 cooperative shares representing one occupied apartment, and 1,767 shares representing seven vacant apartments, at a total purchase price of $222,186. The Rosenbaum Agreement covered 23,833 shares representing eighty-nine occupied apartments, and 5,575 shares representing twenty-five vacant apartments, at a total purchase price of $2,067,063.[1] The two agreements were executed on November 15, 1984, with Miller signing as nominee for the purchasers.

Rosenbaum testified that the purchase of the Apartments by Miller, Adolf, and Cohen was never disclosed to him; his consent to that purchase was never requested; he never saw a list of the 122 apartments prior to the investigation that resulted in the Indictment; the Group had ample funds to have acquired the Apartments; and the Group would have been interested in acquiring them had he been apprised of their availability. He also testified, however, that he never asked to invest more money in the Philip Howard than that expended for the 114 apartments purchased by the Group; there was nothing wrong with Cohen and Miller making a personal investment in the Philip Howard apartments; he had no expectation regarding the

possibility of such a personal investment by Miller or Adolf; and "it was very much within Mr. Miller's cards to do a deal, and if it wouldn't be with my group, it would be with a European group out there."

Tiara required that the purchasers for both agreements advance deposits approximating ten percent of the total purchase price prior to the closing. In his November 2, 1984 letter to Cohen, Miller advised Cohen that the transaction contemplated a total price for occupied apartments of $1,724,519.00 and for vacant apartments of $807,620.00, and that ten percent deposits were needed for both purchases (a total deposit of $253,213.90). The subscription agreements as ultimately executed, however, stipulated an initial down payment of $185,000 followed by a second down payment of $25,000 for the Rosenbaum Agreement, and an initial down payment of $15,000 followed by a second down payment of $3,000 for the Cohen Agreement.

In early November, Miller instructed Cohen to telephone Rosenbaum and request $200,000 for the first down payment. This payment was apparently provided immediately thereafter. In a letter dated November 21, 1984 and addressed to "Mr. Meyer Rosenbaum c/o Avi Cohen" that purported to summarize the "key provisions" of the Rosenbaum Agreement, Miller stated that "[t]he balance of the down payment in the sum of $28,000 is due no later than December 15, 1984." The combined total of $228,000 represented the down payments required under both the Rosenbaum and Cohen Agreements.

Ultimately, the Group made down payments in the total amount of $220,000 that were deposited in an interest bearing account maintained by Tiara's attorneys and credited (including earned interest) against the purchase price at the closing of the Rosenbaum Agreement. Rosenbaum testified that the down payments made by the Group approximated "ten percent of the amount of the apartments that we had times $71 a share," although Miller and Adolf had presumably

---

1. The Rosenbaum Agreement was subsequently amended to reflect upward adjustments of $1,098 in the purchase price and eighteen in the number of shares representing occupied apartments.

negotiated a lower price for occupied apartments as contemplated by the Fee Agreement.

On April 1, 1985, the closing was held at the offices of Tiara's attorneys. Rokowsky was present on behalf of Tiara, and Miller was present as attorney and nominee for the purchasers.

The Rosenbaum and Cohen Agreements required that the purchaser provide the names of the individual persons to whom specific apartments were resold in order that stock certificates and proprietary leases could be executed. To comply with this requirement, Miller, Adolf and Cohen used the maiden name of Cohen's sister-in-law, Dorothy Segal, a Canadian citizen, as the putative purchaser of the units that they were buying pursuant to the Cohen Agreement.[2] Cohen's wife, however, rather than Segal, signed Segal's name to the proprietary leases, and Adolf notarized the signatures. Cohen testified that Miller's stated reason for not using his own name as a principal in the transaction was that he did not want the Philip Howard tenants, Miller's former clients, to learn of his involvement. Miller and Adolf also failed to file with the Attorney General of New York State reports regarding their purchase of the Apartments that are required by New York law. Further, in connection with the subsequent resale of the six units acquired pursuant to the Cohen Agreement, Miller drafted an agreement which falsely stated that Segal was a resident of the United States in order to avoid withholding ten percent of the purchase price and depositing it with the federal government as required by applicable tax law.

Ultimately, Rosenbaum and the Group sold the majority of the 114 apartments that they had purchased at a substantial profit. According to Rosenbaum's testimony, approximately forty of the Group's apartments remained unsold at the time of trial. Miller, Adolf, and Cohen sold their Apartments at a substantial profit. Rosenbaum testified at trial that he considered the investment a considerable success for both himself and the Group; that he was satisfied with Miller's representation; and that he would not have any problem retaining Miller to represent him again.

In 1988, the federal government began investigating the circumstances of the Philip Howard conversion as an outgrowth of an unrelated investigation, subsequently indicting Miller and Adolf for the offenses prosecuted in this action. In a superseding indictment (the "Indictment"), the government charged Miller and Adolf with conspiring to engage in, and engaging in, three separate mail fraud schemes to acquire shares of apartments in the Philip Howard wrongfully, and to defraud their clients of the resulting profits, as well as attendant legal and brokerage fees. Miller and Adolf were acquitted by the jury as to the counts (ten through nineteen) relating to two of the three schemes. Accordingly, this opinion addresses only the single scheme, and the related counts, that resulted in convictions.

The Indictment stated that: "Under New York State law, [Miller and Adolf], as attorneys licensed to practice in the state, owed a fiduciary duty of undivided loyalty, honesty, integrity, and fidelity to all of their clients." The first seven counts of the Indictment alleged the making of seven mailings in violation of the mail fraud statute, § 1341,[3] relating to:

---

**2.** Between the time the Rosenbaum and Cohen Agreements were executed and the closing, some of the vacant apartments designated for sale thereunder were sold to third parties and, as provided by the Rosenbaum and Cohen Agreements, the profits from these sales were divided evenly between the purchasers and Tiara. Two of the units sold were from the eight Apartments included in the Cohen Agreement. Accordingly, Segal's name was used on the documents for six units.

**3.** The version of § 1341 applicable herein is the 1982 codification under which Miller and Adolf were convicted, which provides in pertinent part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any

a scheme and artifice [by Miller and Adolf] to defraud the [Group] and to obtain by means of false and fraudulent pretenses, representations, promises and the concealment of material facts, money and property, to wit:

(i) the eight apartments in [t]he Philip Howard, and the profits from the sale thereof;

(ii) the use of at least $15,000 obtained from the [Group] for the payment of the deposit on the eight apartments in [t]he Philip Howard;

(iii) the fees paid by the [Group] to [Miller and Adolf; and]

(iv) the [Group's] rights under New York State law to the profits and other property interests obtained by [Miller and Adolf] in the course of their representation of the [Group].[4]

The eighth count of the Indictment charged a violation of § 1342, which bars the use of "any fictitious, false, or assumed ... name" to conduct through use of the mail "any scheme or device mentioned in section 1341," by using the name Dorothy Segal to effectuate the fraudulent scheme charged in the first seven counts. The ninth count charged a conspiracy to effectuate that scheme in violation of § 371. Accordingly, conviction under the eighth and ninth counts, as well as the first seven counts, was dependent upon a violation of § 1341.

At trial, Cohen testified for the government pursuant to a cooperation agreement. Rosenbaum, Miller, and Adolf also testified.

On December 13, 1991, the jury returned its verdict convicting Miller and Adolf on six of the seven mail fraud counts charged (all except count two, which charged as a mail fraud a letter not authored by or addressed to Miller or Adolf), count eight (the § 1342 violation), and count nine (the § 371 conspiracy). Both defendants were sentenced to three years probation and 360 hours of community service. Miller was fined $25,000, and Adolf was fined $10,000.

This appeal followed.

## Discussion

■■■ The mail fraud statute, § 1341, renders criminal the use of the mails in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises." *See supra* note 3. Although this formulation might be read disjunctively to provide that obtention of money or property need not be involved in the case of a "scheme or artifice to defraud," the Supreme Court reviewed the history of the mail fraud statute in *McNally v. United States,* 483 U.S. 350, 356–59, 107 S.Ct. 2875, 2880–81, 97 L.Ed.2d 292 (1987), and rejected this interpretation. *Id.* at 359–60, 107 S.Ct. at 2881. Accordingly, as the Court stated in *McNally* and reiterated in *Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), § 1341 "is 'limited in scope to the protection of property rights.'" *Carpenter,* 484 U.S. at 25, 108 S.Ct. at 320 (quoting *McNally,* 483 U.S. at 360, 107 S.Ct. at 2882).[5]

such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

4. In the verdict sheet that recorded the convictions in this case, the jury specified that Miller and Adolf had defrauded the Group as to all these "property interests" except the fees paid by the Group to Miller and Adolf.

5. In 1988, Congress reacted to *McNally* and *Carpenter* by enacting 18 U.S.C. § 1346 (1988). *See* Anti–Drug Abuse Act of 1988, Pub.L. No. 100–690, tit. vii, § 7603(a), 102 Stat. 4181, 4508. Section 1346 provides: "For the purposes of this chapter [which includes § 1341], the term

'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." Although the "usual rule is that federal cases should be decided in accordance with the law existing at the time of decision," *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 662, 107 S.Ct. 2617, 2621, 96 L.Ed.2d 572 (1987), this rule is inapplicable where *ex post facto* criminalization of conduct would result, violative of applicable constitutional prohibitions. *See United States v. Torres,* 901 F.2d 205, 226–27 (2d Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). We have accordingly ruled that retroactive application of § 1346 to conduct occurring before the statute's enactment would constitute an *ex post facto* violation. *See United States v. Schwartz,* 924 F.2d 410, 418–19 (2d Cir.1991); *see also United States v. Bucuvalas,* 970 F.2d 937, 942 n. 9 (1st Cir.

In accordance with *McNally* and *Carpenter,* "[t]he essential elements of a mail fraud violation are (1) a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of the mails to further the scheme." *United States v. Wallach,* 935 F.2d 445, 461 (2d Cir.1991). Miller and Adolf primarily contend that with respect to the property interests alleged in those portions of the indictment on which the jury convicted, *see supra* note 4, the government did not charge and prove the deprivation of a property interest as required by the *McNally/Carpenter* interpretation of § 1341. They also argue that the proof adduced at trial was insufficient in various respects to support their convictions, and that the instructions given the jury were significantly erroneous. We agree with their claim regarding the government's failure to establish a § 1341 property interest, and accordingly do not separately address the latter contentions.

In accordance with the jury verdict, *see supra* note 4, the property interests at issue on appeal are: (1) the Apartments and the profits resulting from their resale; (2) the Group's rights under New York law to the property interests and attendant profits obtained by Miller and Adolf in the course of their representation of the Group; and (3) the use of "at least $15,000" obtained from the Group for the down payments on the Cohen Agreement. We address each in turn. Because the Indictment referred to Miller and Adolph's obligations under New York law as defining the Group's property interests, we look to New York law regarding this aspect of our inquiry.

#### A. The Eight Apartments and the Profits Realized upon their Resale.

The government maintains that Miller and Adolf defrauded the Group of property by "secretly divert[ing]" to themselves eight of the units that Tiara was willing to sell, and that the right to purchase these Apartments and realize the profits resulting from their resale "is a property right under what is sometimes referred to as the economic benefit or constructive trust theory."

In its appeal brief and at oral argument, however, the government also contended that because Miller and Adolph succeeded in negotiating a contract with Tiara for the purchase of 122 units that included the eight Apartments, they had defrauded the Group of a contractual right that qualifies as property under *McNally.* Clearly, and unavoidably, the transfer of all 122 apartments, including the eight at issue, took place pursuant to a contract. Further, a contract right can constitute § 1341 property. *See Granberry,* 908 F.2d at 280. The Group, however, was not a party to the Cohen Agreement, which conveyed the eight disputed Apartments. Accordingly, the question whether they were deprived of a contract right to acquire the Apartments simply restates the issue whether Miller and Adolf wrongfully seized for themselves an economic benefit belonging to the Group.

No plausible alternative argument can be advanced that there was any sort of contract between the Group, on the one hand, and Miller and Adolf, on the other, that called for the acquisition of the Apartments for the benefit of the Group. Rosenbaum's instructions to, and relationship with, Miller and Adolf were ill-defined at best. As previously recounted, Rosenbaum testified that he had no expectation whether Miller and Adolf would invest in Philip Howard Apartments, and did not think that it would be wrong for them to do so. He also testified that Miller had the option to deal with another, rival group of investors. This testimony is inconsistent with the proposition that there was an agreement between the Group and Miller that required inclusion of the Apartments among those conveyed to the Group, much

1992), *cert. denied,* — U.S. —, 113 S.Ct. 1382, 122 L.Ed.2d 758 (1993); *United States v. Loney,* 959 F.2d 1332, 1335 n. 6 (5th Cir.1992); *United States v. Telink, Inc.,* 910 F.2d 598, 601 n. 2 (9th Cir.1990); *United States v. Granberry,* 908 F.2d 278, 281 n. 1 (8th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2024, 114 L.Ed.2d 110 (1991); *United States v. Bush,* 888 F.2d 1145, 1145–46

(7th Cir.1989); *Corcoran v. American Plan Corp.,* 886 F.2d 16, 19 n. 4 (2d Cir.1989); *United States v. Davis,* 873 F.2d 900, 902 (6th Cir.), *cert. denied,* 493 U.S. 923, 110 S.Ct. 292, 107 L.Ed.2d 271 (1989); *United States v. Stewart,* 872 F.2d 957, 960 n. 2 (10th Cir.1989). Thus, § 1346 has no application here; *McNally* and *Carpenter* remain governing authority for this appeal.

less an agreement meeting the exacting standards of an enforceable contract. *See, e.g., 166 Mamaroneck Ave. Corp. v. 151 East Post Rd. Corp.,* 78 N.Y.2d 88, 91, 575 N.E.2d 104, 105–06, 571 N.Y.S.2d 686, 687–88 (1991) (no contract exists unless an agreement is reasonably certain in its material terms or intent of parties can be ascertained using objective standards); *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.,* 74 N.Y.2d 475, 482–83, 548 N.E.2d 203, 205–06, 548 N.Y.S.2d 920, 923 (1989) (same), *cert. denied,* 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990); *see also* Restatement (Second) of Contracts § 33 (1981) (terms of a contract must be reasonably certain).

We are therefore led back to the government's "economic benefit or constructive trust theory." In their capacities as attorneys and brokers for the Group, Miller and Adolf acted as agents for the Group. *See United States v. IBT,* 986 F.2d 15, 20 (2d Cir.1993) (attorney-client relationship one of agent-principal) (citing Restatement of the Law Governing Lawyers, ch. 2, Introductory Note (Tent.Draft No. 5, 1992)); *BAII Banking Corp. v. UPG, Inc.,* 985 F.2d 685, 700 (2d Cir.1993) (broker is a fiduciary); *Polo v. Lordi,* 261 N.Y. 221, 224, 185 N.E. 80, 81 (1933) (real estate broker is an agent); *Gerstein v. 532 Broad Hollow Rd. Co.,* 75 A.D.2d 292, 296, 429 N.Y.S.2d 195, 198 (1st Dep't 1980) (same) (citing *Polo,* 261 N.Y. at 224, 185 N.E. at 81).

 It is settled law that an agent owes his principal a duty of loyalty, and must account for any profits realized in connection with his representation of the principal. *See, e.g., Musico v. Champion Credit Corp.,* 764 F.2d 102, 110 (2d Cir.1985); *Western Elec. Co. v. Brenner,* 41 N.Y.2d 291, 295, 360 N.E.2d 1091, 1094, 392 N.Y.S.2d 409, 411–12 (1977); Restatement (Second) of Agency, §§ 388, 402–403 (1958). In the words of the Supreme Court:

> As the New York courts have recognized: "It is well established, as a general proposition, that a person who acquires special knowledge or information by virtue of a confidential or fiduciary relationship with

another is not free to exploit that knowledge or information for his own personal benefit but must account to his principal for any profits derived therefrom." *Diamond v. Oreamuno,* 24 N.Y.2d 494, 497, 248 N.E.2d 910, 912 [301 N.Y.S.2d 78] (1969); See also Restatement (Second) of Agency §§ 388, Comment c, 396(c) (1958).

*Carpenter,* 484 U.S. at 27–28, 108 S.Ct. at 321. Further, the instrumentality of a constructive trust may be employed to enforce such fiduciary obligations. *See William Wrigley Jr. Co. v. Waters,* 890 F.2d 594, 598–600 (2d Cir.1989) (upholding imposition of constructive trust pursuant to New York law); *see generally In re Koreag, Controle et Revision S.A. (Koreag, Controle et Revision S.A. v. Refco F/X Assocs.),* 961 F.2d 341, 351–55 (2d Cir.1992) (discussing New York law of constructive trust), *cert. denied,* —— U.S. ——, 113 S.Ct. 188, 121 L.Ed.2d 132 (1993).

The government contends that when a fiduciary has realized an economic benefit for which it may be made to account to its principal by means of a constructive trust, the benefit constitutes "property" within the meaning of § 1341. In our view, this sweeping assertion cannot be reconciled with *McNally* and *Carpenter.*

In *McNally,* a state official and private individual were prosecuted for directing state insurance premiums to insurance agencies from which they would derive an economic benefit. The Court rejected the prosecution's contention that a § 1341 conviction could be sustained on the basis that the defendants "did not disclose [the economic interest in an insurance agency] to persons in state government whose actions or deliberations could have been affected by that disclosure." 483 U.S. at 355, 107 S.Ct. at 2879. Rather, the Court ruled that in view of the "money or property" requirement of § 1341, "any benefit which the Government derives from the statute must be limited to the Government's interests as property holder." *Id.* at 358 n. 8, 107 S.Ct. at 2881 n. 8.

In a lone dissent,[6] Justice Stevens observed:

---

**6.** Justice O'Connor joined other portions of Justice Stevens' dissent, but not the passage quoted in the text of this opinion. *See* 483 U.S. at 362, 107 S.Ct. at 2883.

When a person is being paid a salary for his loyal services, any breach of that loyalty would appear to carry with it some loss of money to the employer—who is not getting what he paid for. Additionally, "[i]f an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds, to the principal." Restatement (Second) of Agency § 403 (1958). This duty *may* fulfill the Court's "money or property" requirement in most kickback schemes.

483 U.S. at 377 n. 10, 107 S.Ct. at 2891 n. 10 (emphasis added). Thus, the constructive trust theory that the government urges upon us in this case achieved a tentative endorsement from only one of the justices in *McNally*, and was implicitly repudiated by the balance of the Court.

*Carpenter* ruled that a reporter for the *Wall Street Journal* committed mail fraud by utilizing his knowledge regarding forthcoming "Heard on the Street" columns to trade in stocks discussed in those columns. The Court ruled that the acquired information was § 1341 "property," stating: "Confidential business information has long been recognized as property." 484 U.S. at 26, 108 S.Ct. at 320. The court also noted that such information was a news organization's " 'stock in trade.' " *Id.* (quoting *International News Serv. v. Associated Press*, 248 U.S. 215, 236, 39 S.Ct. 68, 71, 63 L.Ed. 211 (1918)). In contrast, the Court stated that the *Journal's* "contractual right to [the reporter's] honest and faithful service ... [was] an interest too ethereal in itself to fall within the protection of the mail fraud statute." *Id.* at 25, 108 S.Ct. at 320.

■ The foundation of the constructive trust for which the government contends here is the "honest and faithful service" that Miller and Adolf, as attorneys/brokers/agents, owed to the Group. A breach of the obligation to render such service does not, without more, result in a violation of § 1341. Rather, as in *Carpenter*, a separate and identifiable property interest must also be established.

Consistent with this understanding, attempts to impose § 1341 liability on the basis of a constructive trust have fared badly in the aftermath of *McNally* and *Carpenter*. *See, e.g., United States v. Walgren*, 885 F.2d 1417, 1422–24 (9th Cir.1989); *Callanan v. United States*, 881 F.2d 229, 233 & n. 2 (6th Cir.1989), cert. denied, 494 U.S. 1083, 110 S.Ct. 1816, 108 L.Ed.2d 946 (1990); *United States v. Goodrich*, 871 F.2d 1011, 1014–15 & n. 3 (11th Cir.1989); *United States v. Zauber*, 857 F.2d 137, 146 (3d Cir.1988), cert. denied, 489 U.S. 1066, 109 S.Ct. 1340, 103 L.Ed.2d 810 (1989); *United States v. Shelton*, 848 F.2d 1485, 1491–92 (10th Cir.1988) (in banc); *United States v. Ochs*, 842 F.2d 515, 525–27 (1st Cir.1988); *United States v. Holzer*, 840 F.2d 1343, 1348–49 (7th Cir.), cert. denied, 486 U.S. 1035, 108 S.Ct. 2022, 100 L.Ed.2d 608 (1988). *But see United States v. Richerson*, 833 F.2d 1147, 1157 (5th Cir.1987) (alternate holding employing constructive trust theory in reliance upon footnote 10 of Justice Stevens' dissent in *McNally*); *United States v. Fagan*, 821 F.2d 1002, 1010 n. 6 (5th Cir.1987) (same), cert. denied, 484 U.S. 1005, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988).

Further, although not addressing the issue in the specific idiom of constructive trust, we have ruled that *McNally* bars convictions based on prior "decisions in this circuit holding that it constituted wire or mail fraud for an employee to breach a duty to his or her employer and to fail to inform the employer of his or her breach." *United States v. Covino*, 837 F.2d 65, 70–71 (2d Cir.1988). We have also cautioned that: "Useful as ... an elastic and expedient definition of confidential relations, *i.e.*, relations of trust and confidence, may be in the civil context, it has no place in the criminal law." *United States v. Chestman*, 947 F.2d 551, 570 (2d Cir.1991) (in banc), cert. denied, —— U.S. ——, 112 S.Ct. 1759, 118 L.Ed.2d 422 (1992); *cf. People v. Foster*, 73 N.Y.2d 596, 603–04, 541 N.E.2d 1, 4, 543 N.Y.S.2d 1, 4 (1989) ("Conduct which is wrongful in the civil context is not necessarily 'wrongful' within the meaning of the larceny statutes [citations omitted].").

Most of the cases that repudiated the constructive trust approach to § 1341 in the aftermath of *McNally* and *Carpenter* involved allegedly faithless public officials and

their collaborators, however, a fact that raises a distinction of potential significance in this case. In *Ochs*, for example, the criminal activity involved the obtention of a building permit from the City of Boston, and the trial court instructed the jury that it did not have to find that the City actually lost money because of the scheme. 842 F.2d at 524. Construing *McNally*, the First Circuit concluded, on the contrary, that "the mere fact [that] a fiduciary profits from a breach of duty is not a sufficient property deprivation to satisfy the requirements of the mail fraud statute *if the profit was not, directly or indirectly, at the principal's expense*." *Id.* at 526 (emphasis added).

Similarly, in *Holzer*, application of the constructive trust doctrine to a trial judge who accepted bribes was rejected. The Seventh Circuit said:

> The doctrine often and here is remedial rather than substantive.... It is therefore only in an attenuated and artificial sense that the bribe is the principal's property. Holzer is not accused of having *diverted to his own pocket money intended for his employer*; the State of Illinois does not sell justice.

840 F.2d at 1348 (emphasis added).

 In this case, by contrast, the government contends that Miller and Adolf diverted to their own benefit property intended for the Group; to wit, the Apartments and the profits resulting from their resale. Again, however, the government does not surmount the obstacle posed by Rosenbaum's uncontradicted testimony, which undercuts any understanding as to this specific agency relationship that precluded parallel investments by Miller and Adolf in Philip Howard apartments in general, or the eight Apartments in particular. We are thus left not with a specific, identifiable property interest of which Miller and Adolf deprived the Group, but rather (taking into account the jury's refusal to find the fees paid by the Group to have been property obtained by fraud) with a more generalized failure to accord the Group honest and faithful service in Miller and Adolf's fiduciary capacities as attorneys and brokers. This is not enough to satisfy the requirement of § 1341, as construed in *McNally* and *Carpenter*, that the Group be deprived of "money or property" by Miller and Adolf's fiduciary delinquencies.

*Wallach*, which the government presses upon our attention, is not to the contrary. In that case, the breach of fiduciary duties owed to a corporation was coupled with misrepresentations concerning the purpose and true recipients of a $1.14 million payment obtained from the corporation under false pretenses. 935 F.2d at 460–61. There is no question that a scheme designed to obtain money meets the "money or property" requirement of § 1341. *See, e.g., United States v. Eisen*, 974 F.2d 246, 252 (2d Cir.1992), *cert. denied*, —— U.S. ——, ——, ——, 113 S.Ct. 1619, 1840, 1841, 123 L.Ed.2d 178 (1993). In addition, *Wallach* recognized that "[a] stockholder's right to monitor and to police the behavior of the corporation and its officers is a property interest" of which a shareholder may be defrauded by "the withholding or inaccurate reporting of information." 935 F.2d at 463. *Wallach* explicitly recognized, however, that "if no property right was involved, the mail fraud charges cannot survive." *Id.* at 461; *see Schwartz*, 924 F.2d at 416–18 (government's interest in unissued export licenses not property interest, wire fraud convictions reversed); *United States v. Evans*, 844 F.2d 36, 42 (2d Cir.1988) (United States' interest in regulating foreign resale of arms not a property right, dismissal of wire and mail fraud counts of indictment affirmed).

 Finally, we note that the doctrine of constructive trust "is remedial rather than substantive." *Holzer*, 840 F.2d at 1348; *see also* Restatement (Second) of Restitution § 160 cmt. a (1937) ("A constructive trust ... is imposed *as a remedy* to prevent unjust enrichment [emphasis added]."). Further, the remedy comes into existence, and is imposed, at the election of an aggrieved party. *See, e.g., Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 385–87, 122 N.E. 378, 380–81 (1919). These considerations highlight the function of the constructive trust doctrine as a remedial instrument of the civil law, and the inappropriateness of its incorporation into the law of federal mail and wire fraud as interpreted in *McNally* and *Carpenter*.

We conclude that because the Group lacked any contractual right either to retain for themselves the Apartments or the profits from their resale or to bar the defendants from selling the Apartments and retaining the profits, and because a constructive trust theory, standing alone, may not support criminal liability, the Apartments and the profits generated by their resale do not constitute money or property that can serve as the object of a scheme to defraud within the meaning of § 1341.

B. *The Group's Rights to the Property Interests and Profits Obtained by Miller and Adolf.*

In addition to charging the misappropriation of the Apartments and the profits derived from their resale, the government contends that Miller and Adolf defrauded the Group of a "chose in action," i.e., its right to bring a lawsuit to recover the profits from the sale of these eight units. Under this theory, the jury was instructed that if "the defendants intended to deprive the [Group] of the right to bring a lawsuit to recover the profits and other property interests that the defendants acquired for themselves," they would have defrauded the Group of § 1341 "property" and could be found guilty of mail fraud.

The government places primary reliance upon *United States v. Porcelli,* 865 F.2d 1352 (2d Cir.), *cert. denied,* 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989), in support of this basis for conviction. In *Porcelli,* we ruled that an owner of gasoline stations had a " 'direct and independent obligation' " to pay sales tax to New York State on his sales of gasoline, *id.* at 1360 (quoting *In re Rockaway Paint Centre, Inc.,* 249 A.D. 66, 68–69, 291 N.Y.S. 341, 344 (2d Dep't 1936)), and that by submitting false sales tax returns, he acted to deprive the state of "choses in action represented ... in the state tax law providing for an action at law and authorizing the tax commissioner to issue a warrant and to obtain a lien upon the property of the person failing to pay the tax." *Id.* at 1361 (citing N.Y.Tax Law § 1141(a)–(b) (McKinney 1987)).

We do not regard *Porcelli* as controlling here. As we noted in that case, "sales taxes are just that—a tax obligation—and not ordinary debt." *Id.* at 1360; *see also United States v. Helmsley,* 941 F.2d 71, 94 (2d Cir. 1991) ("*Porcelli* stands for the proposition that Section 1341 applies to schemes to avoid paying taxes due."), *cert. denied,* —— U.S. ——, 112 S.Ct. 1162, 117 L.Ed.2d 409 (1992); *cf. Ames Volkswagen, Ltd. v. State Tax Comm'n,* 58 A.D.2d 454, 458–59, 397 N.Y.S.2d 173, 176 (3d Dep't 1977) ("[T]he United States Supreme Court and the courts of this State have consistently characterized the obligations of a vendor required to collect sales taxes as those of a taxpayer."), *aff'd,* 47 N.Y.2d 345, 391 N.E.2d 1302, 418 N.Y.S.2d 324 (1979). Here, by contrast, we have at best ordinary debt; i.e., potential exposure to a constructive trust remedy to account for the profits realized from the sale of the Apartments. As became clear at the oral argument of this appeal, the upshot of extending the "chose in action" rationale to such situations would be to convert every breach of a fiduciary duty that is not openly confessed into a deprivation of § 1341 "property." Such an extension is plainly inconsistent with the dictates of *McNally* and *Carpenter.*

The government also invokes a dictum in *Holzer,* where the Seventh Circuit stated:

Merely because the constructive-trust doctrine allows the beneficiary to obtain restitution of the money or property held in trust, it does not follow that if the "trustee" fails to turn over the trust proceeds when the trust arises (perhaps before he knows they are impressed with a constructive trust) he has stolen the proceeds. We know of no criminal prosecutions based on the theory that the constructive trustee is a thief. We can, however, imagine a different and more persuasive theory linking constructive-trust principles to mail fraud than that advanced by the government: the corrupt public official, having received bribes, takes steps to conceal them in order to defeat the public employer's right to obtain them by means of a suit based on constructive-fraud principles. The employer's right to the bribe money is a thing of value, equivalent to money or proper-

ty—a tangible right, in other words—and the effort at concealment could thus be the scheme to defraud forbidden by the mail fraud statute. There were efforts at concealment here as there are in virtually every bribery case, but no evidence was presented that the efforts were designed to prevent the state from obtaining the bribe money, as distinguished from preventing the state from discovering the bribery and firing or prosecuting Holzer or turning him over to the federal authorities for prosecution. Indeed, so far as we know, the State of Illinois has made no effort to obtain any of the bribe money from Holzer.

840 F.2d at 1348–49.

We need not decide whether this speculation should be adopted as a rule of law in this circuit. The government does not point to any proof of record that Miller and Adolf concealed their acquisition of the Apartments *with the purpose* of inhibiting a suit by the Group to recover the profits realized on their resale. Further, just as the State of Illinois had made no effort to recover the bribe money at issue in *Holzer,* so has the Group refrained from any effort to recover the profits realized by Miller and Adolf on the resale of the Apartments. *Cf. United States v. Eisen,* No. CR–90–0018, 1990 WL 164681, at *3, 1990 U.S.Dist.LEXIS 14219, at *10 (E.D.N.Y. Oct. 19, 1990) (§ 1341 violation can be premised upon proof beyond a reasonable doubt that defendants' objective was to "torpedo" pending malpractice suit).

The government's "chose in action" theory is ultimately premised upon the proposition, stated forthrightly in its brief on appeal, that: "The defendants not only appropriated apartments that by law belonged to their clients without their clients' consent, they also took affirmative steps to conceal this fact from their clients." We have already concluded that this record does not establish that the Apartments "by law belonged" to the Group. Accordingly, the government does not improve its position by postulating a never-pursued lawsuit premised upon an entitlement that we have found to be without legal foundation.

## C. *The Down Payments on the Cohen Agreement.*

The third property interest identified in the Indictment is the "use of at least $15,000 obtained from the [Group] for the payment of the deposit on the [Apartments]." Primarily invoking *United States v. Kerkman,* 866 F.2d 877 (6th Cir.), *cert. denied,* 493 U.S. 828, 110 S.Ct. 95, 107 L.Ed.2d 59 (1989), the government contends that Miller and Adolf's use of the Group's funds to pay down payments required by the Cohen Agreement constituted a deprivation of the Group's "property" by fraud in violation of § 1341.

In *Kerkman,* the defendants entered into a contract with the Michigan Department of Transportation for the construction of a tug boat and four barges. *Id.* at 878. In connection with securing an initial payment of one million dollars, the defendants fraudulently represented that these funds would be used toward the purchase of engines from a subcontractor and for various administrative expenses. *Id.* at 878, 880. In fact, the defendants had extracted an agreement from the subcontractor to kick back a portion of the purchase price for the engines. *Id.* at 878. The defendants then used this kickback to purchase other assets for their business. *Id.* On appeal, the defendants claimed that they had not deprived the State of Michigan of any property because they had been awarded a fixed price contract, so the kickback did not impose any cost upon the state. *Id.* at 880.

The Sixth Circuit rejected this contention, observing that:

> [The Michigan Department of Transportation] was led to believe that the [$1 million] would be used for engine downpayments and administrative expenses. Instead, [the defendants] diverted a portion of the money to purchase a valuable asset.... *The Department of Transportation was thus deprived of a valuable property interest, namely, the use of $1 million for two months.*

*Id.* (emphasis added).

A statement in one of our decisions is arguably in conflict with this view. In *United States v. Yip,* 930 F.2d 142 (2d Cir.), *cert.*

*denied,* —— U.S. ——, 112 S.Ct. 197, 116 L.Ed.2d 157 (1991), a customs broker contested his conviction for mail fraud with respect to funds obtained from a client for the payment of customs duties, contending that the proof at trial "show[ed] only that he intended to make payments late, not that he never intended to pay." *Id.* at 146. We responded as follows:

> Were this the only evidence supporting the government's theory, we might agree; but it was not. Yip's actions in using the funds to bankroll his other corporations, make personal loans to himself, pay off his mortgage, and take out a certificate of deposit in his own name also support the government's theory of the case. A rational trier of fact was entitled to believe that, after a certain point, these activities would bankrupt [Yip's brokerage house]—and that Yip knew this—making his continued acceptance of [his client's] funds fraudulent.

*Id.*

In any event, the factual picture presented here is much more muddled than those addressed in *Kerkman* and *Yip.* In his November 21, 1984 letter to Rosenbaum, Miller represented that a "key provision[ ]" of the Rosenbaum Agreement called for a further down payment of $28,000. Combined with the prior down payment of $200,000, the total of $228,000 was the sum of the down payments due under both the Rosenbaum and Cohen Agreements ($210,000 pursuant to the Rosenbaum Agreement and $18,000 pursuant to the Cohen Agreement). In fact, the down payments ultimately made by the Group totalled $220,000.

Rosenbaum testified, however, that his belief was that the down payments would approximate "ten percent of the amount of the apartments that we had times $71 a share." This would indicate that ten percent of Miller and Adolf's fee, the total of which was the differential between $71.00 per (occupied apartment) share and the actual sale price of $61.00 per share, was to be advanced in connection with the down payments made by the Group. That ten percent approximated $23,800, and substantially exceeded the $10,000 in down payments that the Group paid in excess of their $210,000 down payment obligations under the Rosenbaum Agreement. Further, under applicable New York law, Miller and Adolf had probably earned their entire brokerage fee at that juncture by producing a seller ready, willing, and able to sell on terms acceptable to the Group. *See, e.g., Westhill Exports, Ltd. v. Pope,* 12 N.Y.2d 491, 496–97, 191 N.E.2d 447, 449, 240 N.Y.S.2d 961, 964–65 (1963); *Schaechter v. Regency Properties, Inc.,* 115 A.D.2d 981, 981–82, 497 N.Y.S.2d 793, 794 (4th Dep't 1985); *Duross Co. v. Evans,* 22 A.D.2d 573, 573–75, 257 N.Y.S.2d 674, 676–77 (1st Dep't 1965); *see also Julien J. Studley, Inc. v. Gulf Oil Corp.,* 386 F.2d 161, 165, 167 (2d Cir. 1967) (applying New York law); *Parke–Hayden, Inc. v. Loews Theater Management Corp.,* 789 F.Supp. 1257, 1262–63 (S.D.N.Y. 1992) (same). Thus, even if we were disposed to adopt the *Kerkman* rationale in a clear case, we cannot conclude on this record that Miller and Adolf appropriated to their own use property of the Group and thereby violated § 1341.

### Conclusion

Miller and Adolf's dealings with the Group may not have been a model of candor and disclosure, but they did not constitute felonies proscribed by § 1341. The judgments of conviction are reversed.